## SUPREME COURT.

THE ROCHESTER CITY BANK and LESTER agt. SUYDAM, SAGE & Co.
and SUYDAM and ELY.

The rule prohibiting the disclosure of confidential communications from a client to his attorney does not extend to an attorney acting under a general retainer as attorney, and a general employment as agent, or factor, in relation to the debts and other property of the client in a certain location, where the facts disclosed consist mainly of the instructions received from time to time, as to the management of this business.

A communication to be brought within the protection of the rule, if it does not relate to any suit or legal proceeeding commenced or contemplated, should at least be made under cover of an employment *strictly professional*, and should be such as the business to be done required to be made; it should also be of a *confidential nature*, and *so considered at the time*; and should be shown to have been made with direct reference to the professional business upon which it may be supposed to bear.

Where an attorney or counsel has *an interest in the facts communicated* to him, and when their disclosure becomes necessary *to protect his own personal rights* he must of necessity be exempted from the obligation of secresy.

*Monroe Special Term, January* 1851. This is a motion in behalf of the defendants, to strike out or suppress the affidavit of the defendant Ely, annexed to the complaint, together with certain portions of the complaint itself.

The facts so far as they are necessary to be stated, to present the point raised by the motion, are as follows: The Rochester City Bank and the plaintiff Lester, a banker in Rochester, had discounted during the spring and summer of 1850, bills drawn upon and accepted by the firm of Suydam, Sage & Co. of New York, amounting in the aggregate to $60,000 or upwards, which bills were all protested and returned unpaid, the acceptors having failed and assigned their property to the defendant Ferdinand Suydam, in trust for the payment of debts. The plaintiffs in their complaint allege that the bills were all endorsed by the defendant Alfred Ely, and that before, and at the time of the discounting thereof, they were respectively informed by the said Ely, that he

The Rochester City Bank and Lester agt. Suydam and others.

as the agent and attorney of said Suydam, Sage & Co., had in his hands and under his control and management, a large amount of property, real and personal, belonging to them, consisting of several large and valuable flouring mills, together with bonds and mortgages, and other demands, amply sufficient to indemnify him against his responsibility as endorser, and that he was fully secured for endorsing said bills, by a lien or mortgage upon all such property, and that he exhibited to them papers purporting to give him such lien, which they claim to be available for that purpose; and they aver that the bills were all discounted by them upon the credit of Ely as endorser, and relying upon the property thus in his hands, and his lien thereon, as their security in the premises. They claim to have the property in Ely's hands applied to the payment of the drafts, and pray for an injunction and the appointment of a receiver.

A very large portion of the statements contained in the bill, particularly those which go to show the nature and amount of the property in Ely's hands, upon which the lien is claimed, are avowedly made upon information derived from Ely, consisting to a considerable extent of letters, and extracts from letters, received by Ely from the defendants Suydam, Sage & Co., during his employment by and correspondence with that firm. These statements in the complaint are verified solely by the affidavit of Ely annexed thereto. It is claimed that this affidavit should be suppressed, and so much of the complaint as is based upon information derived from said Ely stricken out, on the ground that Ely was an attorney and counsellor at law, and that the facts disclosed by him consisted of confidential communications from the other defendants, as his clients, to him as their attorney and counsel.

A. WORDEN and S. MATHEWS, *for Plaintiffs.*

J. A. VERPLANCK and G. R. J. BOWDOIN, *for Defendants.*

SELDEN, Justice.—The facts relied upon to support the motion appear from the complaint itself, and the affidavit sought to be suppressed. They show that from the year 1843, up to the time

of the commencement of this suit, Ely had been the general agent and attorney of the firm of Suydam, Sage & Co. to manage their property, collect their debts, and transact for them a very extensive and varied business in the western part of this state; that he prosecuted for them as attorney, during this time, a variety of suits, and recovered judgments to a large amount, and likewise defended suits brought against them; that he foreclosed several mortgages, bid in the property as their agent at the master's sale, and controlled and managed the property afterwards; leasing the same from year to year, and collecting the rents, and selling portions thereof from time to time, pursuant to instructions from the defendants Suydam, Sage & Co. Indeed the statements in the complaint and affidavit, warrant the assumption, that Ely, during the period mentioned, was acting under a general retainer as attorney, and a general employment as agent, or factor, in relation to the debts and other property of the firm of Suydam, Sage & Co. in western New York, and the facts disclosed by him to the plaintiffs, consist mainly of the instructions he received from time to time, as to the management of this business.

The counsel for the motion take the broad ground, that while this general retainer continued, the relation of attorney and client must be held to have existed, and that every communication to Ely during that time from Suydam, Sage & Co. touching their business, falls within the rule prohibiting the disclosure of confidential communications from a client to his attorney. It is essential to the success of the motion to sustain this position; because it was not shown upon the argument, and from my examination of the complaint I have not discovered that any of the information disclosed to the plaintiffs by Ely, consisted of facts communicated to him for the purpose of enabling him to prosecute or defend any suit commenced or contemplated, or with a view to obtaining his professional advice or assistance, in regard to any such suit, unless the enclosing to him of a bond and mortgage, with instructions to foreclose it if not paid, be considered as embracing facts of this description.

The question here presented is one of a nature extremely em-

The Rochester City Bank and Lester agt. Suydam and others.

barrassing. Well might the learned annotator upon Phillips say (*Cow. & Hill's Notes, note* 280), "that the doctrine upon the point, seems quite unsettled by the English cases." He might with equal propriety have added, or the American.

The cases upon the subject are so numerous, as almost to defy perusal, and so conflicting as to render hopeless any effort to reconcile them. They are collected in so many of the modern elementary works, that it is unnecessary to refer to them here. The great point in dispute is, whether the privilege in question, is confined to communications made with a view to the prosecution, defence, or management of some suit, or other judicial proceeding, either actually pending or contemplated at the time, or whether it extends to all communications, made to an attorney or counsel, by one who employs him on account of his supposed professional skill, to transact any other business.

Both sides of this controversy are supported by great weight of authority, some of the ablest judges in the English courts having taken opposite sides upon the question. On looking into the cases, it seems to me, I confess, that in this, as in almost all cases of similar conflicts among judicial tribunals, the difficulty has arisen from courts having too often attempted to apply a rule, without having in view the reason upon which it is founded. In many of the cases upon this subject, counsel and sometimes courts have talked about the impropriety of disclosing that which was communicated in confidence, relying upon the secresy of the recipient; as if the betrayal of a trust, or confidence reposed, had something to do with the matter; whereas nothing can be clearer, than that the rule in question rests upon no such foundation.

If the obligations of faith and honor to preserve inviolate a secret confided, formed the basis of the rule, where could those obligations be stronger, or more perfect, than in the case of the physician or the divine, and yet it was abundantly settled, that at common law the rule did not extend to either. The statute of this state (2 *R. S.* 406, § 91, 92), extending the protection to physicians and ministers under certain circumstances, is guarded in its provisions, and is based upon reasons peculiar to the cases pro-

33

vided for. Indeed, if the foundation of the rule was such as we have been considering, no just reason can be given, why it should not extend to a confidential communication to a private individual, who is as much bound in honor to a faithful observance of the trust as an attorney or counsel.

It is equally clear, that it is not because attorneys and counsellors are officers of the court, that the latter interferes to prevent its own officers from violating a trust reposed in them; because if this were so, it is difficult to discover any reason why the same rule should not be applied to sheriffs, clerks, &c. who are equally under the control of the courts and upon whom the moral obligation to observe good faith is just as strong as upon an attorney.

·Again, the rule is not founded upon any broad views of public policy, growing out of the inconveniences to society, of having confidential communications which the exigencies of the community require should be frequently made, liable to be disclosed, because this reasoning would apply with equal force to confidence reposed in many cases which have never been held to be within the protection of the rule.

The doctrine in question has a narrower foundation than any of these. It is simply this: Anciently, when lawsuits were comparatively rare, parties litigant came into court and prosecuted or defended their causes. They were not obliged, however, to be witnesses in their own cases, and could not be compelled therefore to disclose facts within their own knowledge alone. Afterwards when lawsuits became more numerous, and the law itself more complex, it became indispensable to have a body of men trained to and skilled in the laws, and the conducting of suits, and to have the business of courts transacted by these learned men. Suitors were therefore in a measure constrained to employ these professional men to carry on their litigations, and of course were compelled to disclose to them the facts within their own knowledge, bearing upon the matters in dispute. If the facts thus communicated were liable to be extorted from the attorney or counsel, suitors would hesitate to employ them, to the great inconvenience of the court, and obstruction of judicial business.

The rule we are considering, therefore, was adopted to remove this difficulty, and was a mere extension of the immunity of the party to his substitute, the attorney. In other words, while the courts for their own convenience, encouraged their suitors to employ men of skill to conduct their suits, and to communicate to them the merits of their cases, they at the same time said that these communications should have the same inviolability as if they remained locked in their own breasts.

It was just because, the law constrained the disclosure for its own purposes, that the law protected it.

That this was the true origin and foundation of the rule is, as it seems to me, apparent; because it has been successfully shown that none of the other grounds upon which it has been sometimes supposed to rest, are tenable, and that if the rule had any other conceivable basis, it must embrace other cases than those of attorney and counsel, to which it has been uniformly limited.

But the position I have taken, is not without direct authority to support it. Of all the numerous cases to which I have referred in the course of the examination I have given this question, that in which the subject has been the most elaborately and as I think the most ably treated, is the case of Annesly vs. The Earl of Anglesea, before the barons of the Irish Exchequer (17 *How. State Trials*, 1139). The question was argued by several of the ablest members of the Irish bar upon each side, including the attorney and solicitor generals. The decision in that case, has a direct bearing upon the question presented by the facts of this particular case; but it is not for that purpose that I cite it so much as for its illustration and support of the position I have taken, as to the *origin* of the rule we have been considering.

I will quote here only the language of Mr. Baron Mounteney on this subject. He says at page 1240, " Mr. Recorder hath very properly mentioned the foundation upon which it hath been held, and is certainly undoubted law, that attorneys ought to keep inviolably the secrets of their clients, viz. That an increase of legal business, and the inability of parties to transact that business themselves, made it necessary for them to employ (and as

the law properly expresses it *ponere in loco suo*), other persons who might transact that business for them. That this necessity introduced with it, the necessity of what the law hath very justly established, an inviolable secresy to be observed by attorneys, in order to render it safe for clients to communicate to their attorneys all proper instructions for the carrying on of their causes, which they found themselves under the necessity of entrusting to their care." The views of the other judges harmonize with those of Mr. Baron Mounteney, but they are less explicit upon the point.

Again, in the case of Dixon vs. Parmelee (2 *Ver. R.* 185), Mr. Justice Paddock, in considering the same question, uses the following language: " And this distinction seems to give a clue to that which is said to be the origin of the law, which is, that in early days suitors brought in person their complaints before the king, and afterwards his court; that as business increased, the administration of justice approximating to a science, and the necessity of forms sensibly felt, it became absolutely necessary that there should be a set of men to stand in the place of suitors, called attorneys, and manage their causes, to encourage which and bring the same into practice, it also became necessary for courts to adopt a rule by way of pledge to suitors, that their secret and confidential communications to their attorneys, should not be drawn from them either with or without the consent of such attorney."

These authorities seem to me to accord so perfectly with the conclusions to which a careful analysis of the principles applicable to the subject, and of the cases acknowledged to be law, would lead us, that I feel justified in adopting them as a true exposition of the rule. There are many other cases having the same tendency, but I cite only these, as bearing most directly upon the point. It follows from this reasoning, that originally no communications were protected except such as related to the management of some suit or judicial proceeding in court, then actually pending, or in the contemplation of the parties at the time; and if the numerous cases in which a wider scope has been

The Rochester City Bank and Lester agt. Suydam and others.

given to the rule, should be held to have in some degree enlarged its application, this departure from the true principle, ought to be confined within as narrow limits as possible, since the whole doctrine is in conflict with the general policy of the law. Fortunately, we are not embarrassed in endeavoring to place this matter upon a just basis, by any decisions of our own courts, no case in this state having extended the rule beyond what is here contended for, unless it be that of Wilson vs. Troup (7 *Johns. Ch. R.* 25; 2 *Cow. R.* 195, *S. C.*), and even there, the business in relation to which the communication was made, was quasi of a judicial nature.

I think the communication to be brought within the protection of the rule, if it does not relate to any suit or legal proceeding commenced or contemplated, should at least be made under cover of an employment strictly professional, and should be such as the business to be done required to be made; it should also be of a confidential nature, and so considered at the time, and should be shown to have been made with direct reference to the professional business upon which it may be supposed to bear. I have discovered nothing of this kind in the facts shown in this case, to have been communicated to Ely, and by him disclosed to the plaintiffs; none of these facts seem to have been communicated to Ely with a particular view to any legal business to be done by him either as attorney or counsel, but they appear to have come to his knowledge, from time to time, during a seven years employment; sometimes as attorney, and constantly as agent, and to have related as much to his business in the latter capacity as the former.

Whether the basis of the rule, therefore, for which I have contended be the true one or not, I do not see how this case is to be brought within any well established expansion of it.

The motion to suppress or strike out therefore, in my opinion, can not prevail.

But independent of this reasoning, and admitting all the previous conclusions to be erroneous, there is still another ground upon which, in my judgment, this motion must be denied. I think

that where the attorney or counsel has an interest in the facts communicated to him, and when their disclosure becomes necessary to protect his own personal rights, he must of necessity and in reason be exempted from the obligation of secresy. For instance suppose a client makes a private and confidential statement of facts by letter, to an attorney employed to conduct a suit, inducing him to take a particular course with the suit, which proves eminently disastrous, and he is afterward prosecuted by his client for unskilful management of the cause, can it be claimed that he can not produce the letter in his justification? I apprehend not. It would be most harsh and unjust to place the attorney in a position in which he must act in view of virtual instructions from his client, and yet deprive him of the only means of protecting himself. Many other cases might be supposed, falling within the same principle, and the present seems to be one of the class. Here the attorney has a large amount of property in his hands, which has accumulated during a seven years employment, the nature and extent of which is shown by his correspondence with his clients. Under these circumstances, he is induced by them to assume heavy responsibilities upon the faith and security of this property. Is he to be deprived of what may very likely be his only means of showing in what this property consists, by producing his clients' letters in relation to it? I think no such construction has ever been put upon the rule in question. His clients by giving him a direct interest in the facts, from time to time, communicated to him, and by dealing with him upon the footing of those facts, have, as it strikes me, voluntarily waived their right to concealment as between themselves and the attorney.

If then, Ely would have a right in a legal contest between himself and his clients, in regard to his indemnity against the responsibilities assumed, to make use of the facts within his knowledge; then I do not see why the plaintiffs, who are in equity subrogated to his rights, may not do the same. This suit is virtually for his benefit, as the application of the property claimed to the payment of the drafts, discharges him pro tanto from responsibility.

There is still another question presented by this motion. I refer to the effect which the recent change in the law in regard to the examination of the parties as witnesses, should have upon the rule of law involved in this motion; as the consideration of this question, however, in the view I have taken of the subject, is not necessary to the decision of the motion, I shall not attempt to pass upon it here.

The motion must be denied with ten dollars costs for opposing.