[No. 11991.   In Bank. — July 17, 1889.]

# SARAH ALTHEA SHARON, RESPONDENT, v. FREDERICK W. SHARON, EXECUTOR, ETC., OF WILLIAM SHARON, DECEASED, APPELLANT.

APPEAL — EXHIBITS — HOW MADE PART OF STATEMENT. — Where certain exhibits claimed to have been used in evidence are referred to in the body of the statement on motion for new trial, — as, "Plaintiff's exhibit No. [giving the number]; see end of statement," and such exhibits are set out in an appendix to such statement, properly numbered, preceded by the recital, "The following are the exhibits offered and read in evidence on behalf of the plaintiff, and mentioned in the foregoing statement," — they are thereby sufficiently identified and incorporated in and made a part of such statement.

ID. — CERTIFICATE OF JUDGE — AUTHENTICATION. — The certificate of the judge that "the *foregoing* statement on motion for a new trial has been settled and allowed by me" includes and authenticates such exhibits as a part of such statement, although the certificate is attached to the body of the statement and *precedes* the exhibits. (*Kimball* v. *Semple*, 31 Cal. 657, *People* v. *Bartlett*, 40 Cal. 146, *Bush* v. *Taylor*, 45 Cal. 112, *Thompson* v. *Paterson*, 54 Cal. 542, distinguished on this point.)

ID. — OMISSION TO INCLUDE EXHIBITS IN TRANSCRIPT — REMEDY. — Where such exhibits appear to have been included in the statement in the manner above stated, the fact that some of them have been omitted from the transcript is not ground for striking out the whole statement. The remedy of the respondent is to suggest a diminution of the record and have them brought up. (THORNTON, J., dissenting.)

ID. — DEPOSITIONS — HOW MADE PARTS OF STATEMENT. — Depositions being on file may be made part of the statement by calling for them by the words "here insert," at the proper place; and when the transcript is made up they should be copied in full where called for.

ID. — OMISSION TO INSERT EXHIBITS IN STATEMENT — WAIVER. — Where an exhibit is omitted from the statement, and no objection is made, and the attorneys for respondent indorse on the statement, "The foregoing statement agreed to by us," and the same is thereupon signed by the judge, the objection that such exhibits have been omitted is waived, and such omission presents no cause in this court for striking out the statement, or any part of it.

ID. — Where counsel stipulate that all depositions on file may be "read and referred to on the hearing of defendant's motion for a new trial herein as part of the foregoing statement," and that the same "shall be printed in the transcript on appeal," and "form a part of the statement," a strict compliance with the requirements of the statute as to the manner of making them parts of such statement is waived.

FORMER ADJUDICATION BY FEDERAL COURT CANNOT BE PRESENTED FOR FIRST TIME ON APPEAL. — The point that the subject-matter of this

| 79 | 633 |
|----|-----|
| 80 | 388 |
| 79 | 633 |
| 81 | 105 |
| 81 | 425 |
| 79 | 633 |
| 82 | 260 |
| 79 | 633 |
| 84 | 433 |
| 84 | 627 |
| 84 | 653 |
| 79 | 633 |
| 86 | 487 |
| 79 | 633 |
| 87 | 114 |
| 79 | 633 |
| 89 | 50 |
| 79 | 633 |
| 99 | 288 |
| 79 | 633 |
| 104 | 634 |
| 79 | 633 |
| 105 | 360 |
| 79 | 633 |
| 114 | 72 |
| 79 | 633 |
| 115 | 163 |
| 79 | 633 |
| 124 | 657 |
| 124 | 662 |
| 125 | 135 |
| 79 | 633 |
| 127 | 39 |
| 79 | 633 |
| f128 | 310 |
| 79 | 633 |
| 133 | 20 |

action has been adjudicated and determined against the respondent by a United States circuit court cannot be presented for the first time in this court by the presentation of the proceedings and judgment of said court, where it appears that, conceding said last-named judgment is paramount to that of the court below, both of said courts had jurisdiction of the subject-matter and the parties, and that, without the pendency of the action in the federal court being brought to its attention, the court below proceeded to final judgment.

ID. — VALIDITY AND EFFECT OF JUDGMENT — REMEDY. — The fact that two courts of concurrent jurisdiction render judgments antagonistic to each other, involving the same subject-matter, does not prove that the judgment of either is void, or, necessarily, that either is erroneous; but the question being which shall prevail, the question may be raised when an attempt is made to enforce the judgment in the court below.

ID. — JURISDICTION. — Whether the federal court had or had not jurisdiction, and the question as to which of the judgments referred to should prevail, not decided.

LAW OF THE CASE — DOCTRINE OF NOT APPLICABLE. — Where two appeals are taken in the same case, one from the judgment, and the other from the order denying a new trial, a judgment of this court on the appeal from the judgment which has not been acted upon by the court below, or the parties, does not become the law of the case so far as to affect the right or power of this court to determine any and all questions presented on the appeal from the order denying a new trial to the extent, if necessary, of modifying the former decision. (THORNTON, J., dissenting.)

ID. — Where there are two such appeals, the whole case must be held to be under the control of this court until the whole is disposed of, and the cause remanded for further proceedings in the court below. (THORNTON, J., dissenting.)

FINDINGS — CONFLICT OF EVIDENCE. — Where there is a substantial conflict of evidence, the findings of the court below will not be disturbed, on the ground that such findings are not sustained by the evidence.

MARRIAGE WITHOUT SOLEMNIZATION — LIVING AND COHABITING TOGETHER IN THE WAY USUAL WITH MARRIED PEOPLE — MUTUAL ASSUMPTION OF MARITAL RIGHTS, DUTIES, AND OBLIGATIONS — FINDING OF NOT SUSTAINED BY THE EVIDENCE. — A finding that the plaintiff and defendant lived and cohabited together in the way usual with married people, and that they assumed toward each other marital rights, duties, and obligations, is not sustained by evidence that after executing a contract of marriage they secretly occupied the same bed, concealed the fact that such a contract had been executed, or that they were husband and wife, and held themselves out to the public as single and unmarried people, occupied separate dwelling-places, had no common home, and in all things conducted themselves toward the public as unmarried people. (THORNTON, J., dissents on ground of former adjudication.)

ID. — ASSUMPTION OF MARITAL RIGHTS, DUTIES, AND OBLIGATIONS — SEXUAL INTERCOURSE. — The mere fact that parties who have agreed to become husband and wife thereafter have sexual intercourse is not sufficient of itself to show a consummation of the marriage, or that they have as-

sumed toward each other marital rights, duties, and obligations, within the meaning of section 55 of the Civil Code. (THORNTON, J., dissents on ground of former adjudication.)

ID. — CONSENT — CONSUMMATION — SEXUAL INTERCOURSE — COHABITATION. — Consent to marry is not enough under section 55 of the Civil Code. It must be followed by solemnization or a mutual assumption of marital rights, duties, and obligations. Cohabitation is a "living together as husband and wife," and will amount to a consummation or mutual assumption of marital rights, duties, and obligations; but sexual intercourse in the manner usual with man and mistress, and without living together as husband and wife, will not amount to such consummation. (THORNTON, J., dissents on ground of former adjudication.)

ID. — QUESTION OF LAW. — Whether, giving full credit to it, the evidence proves a mutual assumption by the parties of marital rights, duties, and obligations is a question of law, and not a question of the weight of evidence.

ID. — MARRIAGE BY CONTRACT — SECRECY CLAUSE. — The validity of a written marriage contract, otherwise valid as a consent to marry, is not affected by a covenant therein by one of the parties that the contents of the writing and its existence shall be kept secret for a certain time after its execution, unless the other party shall see fit to make it known.

EVIDENCE — EXHIBITION OF CONTRACT CLAIMED TO HAVE BEEN A FORGERY. — Evidence on the part of the plaintiff that she had, long prior to any difficulty between herself and the defendant, shown to a third party what she alleged to have been a marriage contract between them, and which the defendant claimed to have been a forgery, was competent as tending to show its genuineness.

ID. — WITNESS — CROSS-EXAMINATION — IMPEACHMENT. — A witness cannot be impeached by evidence of particular wrongful acts, nor is it proper to question the witness as to such matters on cross-examination. (THORNTON, J., reserves his opinion.)

ID. — ANSWER NOT REQUIRED — EFFECT OF QUESTION. — But where such a question is asked, but no answer is required or given, no available error is committed.

ID. — OBJECTION, WHEN NECESSARY. — Where a question as to a particular wrongful act is asked, and objected to, and the court states to counsel what he may ask, and he proceeds to ask further questions as directed by the court, but within the objection already made, a further objection to each of the questions so asked is not necessary to raise the question of the competency or relevancy of the evidence in this court.

ID. — OBJECTION BY PARTY — REFUSAL TO ANSWER BY WITNESS. — Whether the question put is pertinent or not, the witness may decline to answer, on the ground that to do so would tend to criminate him; but where the question is not pertinent, the party introducing him may object thereto, and his objection should be sustained, whether the witness objects to answering or not. (THORNTON, J., reserves his opinion.)

ID. — ATTORNEY AT LAW — CONFIDENTIAL COMMUNICATION. — The testimony of a witness as to conversations with a party to an action cannot be excluded on the ground that the witness was an attorney at law and the

communication was confidential, unless it appears that he was the attorney for the party, and the communication was made in the course of professional enployment.

ID. — And it must appear that the communication was in fact confidential, or at least that it was so regarded at the time by the party making it.

ID. — BURDEN OF SHOWING COMMUNICATION TO HAVE BEEN CONFIDENTIAL. — The burden is upon the party seeking to suppress the evidence to show that it is within the terms of the statute relating to confidential and privileged communications.

ID. — PRESUMPTION. — The presumption is, that all communications between attorney and client are confidential, but this presumption may be rebutted.

ID. — MOTION TO STRIKE OUT EVIDENCE — PRACTICE — QUESTION ON RULING, HOW PRESENTED ON APPEAL. — Where the witness has testified, and his testimony is stricken out on motion, on the ground that the same relates to communications that were confidential, the question as to the correctness of such ruling is properly preserved by an exception thereto, and may be presented to this court by assigning the same as an error of law.

ID. — GROUND FOR STRIKING OUT. — That a witness who has testified to a conversation is not positive that the person with whom he had such conversation was the party, but gives it as his opinion that she was, his testimony cannot be stricken out on the ground that he has not identified the person. Whether he has or not goes to the weight to be given to the evidence, and not to its competency or relevancy.

ID. — COMMUNICATION IN PRESENCE OF PARTY — MATERIALITY. — Where the plaintiff had testified that during a certain time she was the wife of the defendant, evidence of a statement by a third party, in her presence and hearing, during said time, that she, the plaintiff, desired to bring a suit against the defendant for breach of promise of marriage was competent and material.

NEW TRIAL — JUDGMENT — ANCILLARY PROVISIONS FOR REFERENCE — MOTION INITIATED BEFORE REFEREE'S REPORT — JURISDICTION. — In an action for a divorce, a judgment decreeing the divorce and providing for a division of the community property is the final judgment, although it contains ancillary provisions appointing a referee to take testimony and report as to what property is community; and a motion for a new trial, made after the entry of such judgment, but before the coming in of the referee's report, is not premature. The trial court has jurisdiction to hear and determine the motion, and the supreme court has jurisdiction of an appeal from an order made thereon.

APPEAL from an order of the Superior Court of the city and county of San Francisco refusing a new trial.

The facts are stated in the opinion of Mr. Justice Works.

*S. M. Wilson*, and *William F. Herrin*, for Appellant.

This court has the right to consider and is bound by the decree of the United States circuit court. (*Poole* v. *Seney*, 70 Iowa, 275; *Waldron* v. *Ely*, 2 N. J. L. 79; *Steelman* v. *Ackley*, 2 N. J. L. 165; *Anderson* v. *Radley*, 3 N. J. L. 1034; *Dakota County* v. *Glidden*, 113 U. S. 226; *United States* v. *Schooner 'Peggy*, 1 Cranch, 103; *United States* v. *Preston*, 3 Pet. 57; *Yeaton* v. *United States*, 5 Cranch, 281; Smith's Com., secs. 772, 774; *Stoever* v. *Immell*, 1 Watts, 258; *Commonwealth* v. *Duane*, 1 Binn. 601, 608; 2 Am. Dec. 487.) There is no evidence to sustain the finding that the parties lived or cohabited together, or that they mutually assumed towards each other marital rights, duties, and obligations. The word "cohabitation" does not import the act of sexual intercourse; but as applied to husband and wife, it imports simply the fact that they dwell together as such in a common home. (*Yardley's Estate*, 75 Pa. St. 211; *Ohio* v. *Connaway*, Tapp. 59; *Calef* v. *Calef*, 54 Me. 366; 92 Am. Dec. 549; Bouvier's Law Dict., word Cohabit; *Cannon* v. *United States*, 116 U. S. 55; *Orme* v. *Orme*, 2 Add. Ecc. 382; *Foster* v. *Foster*, 1 Hagg. Const. 144.) Cohabitation is essential to a mutual assumption of the marital rights, duties, and obligations, and is essentially involved in the marriage agreement. (Shelford on Marriage and Divorce, 9; *Lindo* v. *Belisario*, 1 Hagg. Const. 216; *Teter* v. *Teter*, 101 Ind. 135; 51 Am. Rep. 742; *Sapp* v. *Newson*, 27 Tex. 541; *Lewis* v. *Ames*, 45 Tex. 341; *Lonas* v. *State*, 3 Heisk. 308; *Askew* v. *Dupree*, 30 Ga. 178; *Harrod* v. *Harrod*, 1 Kay & J. 4; *Adams* v. *Palmer*, 51 Me. 484; *Green* v. *State*, 58 Ala. 194; 29 Am. Rep. 739.) The term "consummation of marriage," as employed in section 57 of the Civil Code, does not import "simply sexual intercourse, copulation, —nothing more nor less." (*Morrison* v. *Dobson*, 8 Ses. Cas. S., 3d series, 347; *Surtrees* v. *Witherspoon*, 11 Ses. Cas. S., 3d series, 384; *Robertson* v. *State*, 42 Ala. 509; *Estate of Beverson*, 47 Cal. 621; *Peck* v. *Peck*, 12 R. I. 488; 34

Am. Rep. 702; *Stoltz* v. *Doering*, 112 Ill. 234; *Hebblethwaite* v. *Hepworth*, 98 Ill. 126, 132, 133; *Londonderry* v. *Chester*, 2 N. H. 281; 9 Am. Dec. 61; *Rundle* v. *Pegram*, 49 Miss. 755; *Askew* v. *Dupree*, 30 Ga. 189; *Roche* v. *Washington*, 19 Ind. 55; 81 Am. Dec. 376; *Clark* v. *Cassidy*, 64 Ga. 666.)

*D. S. Terry, J. G. Maguire*, and *W. T. Baggett*, for Respondent.

The opinion on the former appeal from the judgment constitutes the law of this appeal. (*Hinsley* v. *Rose*, 5 Cranch, 314; *Martin* v. *Hunter's Lessee*, 1 Wheat. 355; *Browden* v. *McArthur*, 12 Wheat. 53; *Sibbald* v. *United States*, 12 Pet. 492; *Corning* v. *Troy*, 15 How. 466; *Sizer* v. *Many*, 16 How. 103; *Roberts* v. *Cooper*, 20 How. 481; *Tyler* v. *Magwire*, 17 Wall. 283; *Supervisors* v. *Kennicott*, 94 U. S. 498; *Ames* v. *Quimby*, 106 U. S. 342; *Clark* v. *Keith*, 106 U. S. 464; *Geer's Adm'r* v. *Williamson*, 1 Port. 313; 27 Am. Dec. 634, and cases cited in note; *Fortenberry* v. *Frazier*, 5 Ark. 200; 39 Am. Dec. 373, 374; and *Ross* v. *Bank of Burlington*, 1 Aik. 43; 15 Am. Dec. 665, and note.)

WORKS, J.—This action has been before this court on an appeal from the judgment. The findings were held to support the judgment, and the judgment was affirmed. (*Sharon* v. *Sharon*, 75 Cal. 1.)

The present appeal is from the order denying a new trial, and presents for our consideration, in addition to errors alleged to have occurred during the trial, the question whether the findings of the court below on the main issues in the case are supported by the evidence.

Preliminary to these questions arising on the merits, we are called upon by both the respondent and the appellant to determine certain objections to the consideration of the case.

The respondent contends that the statement on motion

for a new trial, as it appears in the transcript, was not properly made up and authenticated, and on that ground moves to strike out what purports to be such statement. She also moves to strike out certain parts of the transcript purporting to be a part of the statement, on the ground that such parts are not included in the statement as certified by the judge of the court below. The objection most relied upon in respect to these motions is, that certain exhibits used in evidence do not appear in the body of the statement, but are referred to therein and included in what may be called an appendix, following the authentication of the judge, and mainly in a separate volume of the record. The record in this cause consists of five large volumes in no way connected with each other, or identified as belonging to the same action, except by the number and title of the case, and the consecutive numbers of the volumes and pages. The certificate of the judge to the statement appears in volume 3 of the transcript, and is as follows: "The *foregoing* statement on motion for a new trial has been settled and allowed by me, and is correct."

In the body of the statement, certain exhibits are referred to as follows: "Plaintiff's exhibit No. [giving the number]; see end of statement." Immediately following the authentication of the statement by the judge are certain exhibits, preceded by the following statement:—

"The following are the exhibits offered and read in evidence on behalf of the plaintiff, and mentioned and referred to in the foregoing statement"; "Plaintiff's exhibit No. 1,"—followed by such exhibit in full, and so on with the others in their order, as referred to in the statement where introduced in evidence.

The point made is, that the exhibits appear by the statement to have been a part of the evidence in the case; that the reference to them in the manner above stated does not make them a part of the statement, and

that therefore the statement is a mere "skeleton," and the whole of it should be stricken out.

In support of this contention, counsel cite *Kimball* v. *Semple,* 31 Cal. 657; *People* v. *Bartlett,* 40 Cal. 146; *Bush* v. *Taylor,* 45 Cal. 112; *Thompson* v. *Patterson,* 54 Cal. 542.

The case of *Kimball* v. *Semple* differs materially from the one at bar. There the court said: "This statement, however, is but a skeleton statement. It states, for example, that certain patents, deeds, etc., were introduced in evidence, and then says '(here insert patent),' '(here insert deed),' '(here insert all of deed except acknowledgment),' '(here insert descriptive part of deed and conditions),' etc.; *but the transcript does not contain the deeds, patents, descriptive portions, etc.*"

The transcript before us does not call for the exhibits by a mere "here insert," and then omit them. They are called for by reference to them by their numbers, and to the place where they will be found at the end of the statement. Instead of being omitted, they are found in the transcript at the place referred to.

The other cases cited are to the same effect as *Kimball* v. *Semple,* and do not support the objection made. The documents referred to are set out in the statement. The reference to them in the body of the statement and the introductory matter preceding such exhibits, where they appear at the end of the statement, are amply sufficient to identify them.

But it is further contended that the authentication of the judge *precedes* these exhibits, and that, as he only certifies to the correctness of the "*foregoing*" statement, they are not covered by his certificate, and are not, for that reason, authenticated at all. There might be some force in this position if it were not for the fact that the "foregoing" calls these exhibits into and makes them a part of the statement. But as they are so brought into it, it is wholly immaterial whether the exhibits precede

or come after the judge's certificate. (*Kirstein* v. *Madden*, 38 Cal. 160.)

It is further claimed that a part of these exhibits do not appear in the transcript, either in the body of the statement, or in what we have called the appendix. If they do not, the remedy of the respondent was to suggest a diminution of the record, and have them brought up. They appear to have been made a part of the statement, but do not appear in the transcript. In the case of *Kimball* v. *Semple, supra,* cited and relied upon by the respondent, this court said: "Some portions of the record may be accidentally omitted, or some error made and not discovered till after the transcript is filed. Such accidental omissions may be corrected on suggestion of diminution of the record, in pursuance of rule 12. But when a diminution of the record has been suggested, and an order directing the clerk to certify up the part desired, it is still the duty of the appellant to see the order complied with."

This court will not entertain a motion to strike out the entire statement because of the omission to insert in the transcript and bring up some paper called for and made a part of such statement until the proper steps have been taken to have the paper certified up by the clerk of the court below.

In respect to certain depositions, they are called for as follows: " (Here insert the deposition of C. D. Cushman.) " The deposition is not inserted at this place, but does appear in another place in the record, viz., with the exhibits at the end of the statement, and is there identified as " Deposition of C. D. Cushman." Unlike the exhibits, it is not referred to as being set out at this place. But we think the respondent has effectually estopped herself to object to the statement on this ground. If the statement did not contain the evidence necessary to present the questions relied upon properly, the time to make the objection was at the settlement of the state-

ment. Not only did she fail to raise the question of the sufficiency of the statement in this respect, but her then attorneys indorsed upon it: "The foregoing statement agreed to by us." Two objections were then made to the settlement of the statement, not affecting its form; the first being, that the court had no jurisdiction, for the reason that an appeal had already been taken from the judgment, and the second, that the same was not prepared and served within the time allowed by law. In this condition of the record, the respondent cannot be heard to question the sufficiency of the statement as a whole, conceding that the deposition was omitted entirely.

The motion to strike out parts of the record goes to the exhibits and depositions above referred to, and is based upon the ground that such papers are not properly authenticated. To sustain this motion would be a convenient and easy way of disposing of the case. It would take out of the statement evidence absolutely necessary to sustain the findings in favor of the respondent, and compel us to reverse the case on that ground. The respondent could not properly complain of the court for making this disposition of her case at the instance of her own attorneys, but we are firmly convinced that the motion is not maintainable, and must be overruled.

As to the exhibits, we have shown above that they are so referred to and made parts of the statement as to bring them under the judge's certificate. Therefore they are properly authenticated. So far as the motion goes to certain affidavits, used in support of the motion for a new trial, the appellant has furnished us with the judge's certificate authenticating the affidavits used by the appellant, and he admitted at the argument that the affidavits purporting to have been used by the respondent in opposition to the motion are the affidavits actually used by her, which disposes of that part of the motion.

As to the depositions, they were a part of the files in

the case, and we think, in addition to what is said above with reference to them, that they were properly called for in the statement by a "here insert," and if not in the proper place in the transcript, they could be brought up by an order of this court. Papers on file with the clerk may be called for by a mere reference, and afterward inserted. (*Darst* v. *Rush*, 14 Cal. 83; *Connor* v. *Morris*, 23 Cal. 450.) Beside, there appears in the transcript this stipulation, signed by the attorneys for both parties:—

"It is hereby stipulated and agreed by and between the respective parties hereto that the whole or any portions of the depositions on file in this case which were used on the trial thereof may be read and referred to on the hearing of defendant's motion for a new trial herein as part of the foregoing statement, and that the whole of said depositions, or the portions so read or referred to, shall be printed in the transcript on appeal from the order refusing or granting a new trial herein, and shall form a part of defendant's statement on motion for new trial or on appeal."

This stipulation must be held to be a waiver of the strict requirements of the statute with respect to the manner of setting out these depositions in the statement if the statute had not been complied with.

This action is for a decree declaring valid an alleged marriage by contract, without solemnization, between the deceased, William Sharon, and the respondent, for a divorce, and for a division of the community property. The marriage alleged was by a written contract, which the plaintiff claimed to have been genuine. The deceased, on the contrary, maintained the alleged contract to be a forgery. The court below determined that the contract was valid, rendered a decree so declaring, and granting the respondent a divorce and a share of the community property. The defendant moved for a new trial, which was denied, and it is from this order deny-

ing a new trial that the executor is prosecuting this appeal.

Shortly before the commencement of this action, the defendant commenced an action in the circuit court of the United States, ninth circuit, district of California, against the respondent as Sarah Althea Hill, in which he alleged, in substance, that he was a resident of the state of Nevada; that he and the respondent were both unmarried; that she was claiming to be his, the said Sharon's, lawful wife, and had assumed his name; that she was pretending that they had entered into a written contract of marriage, and did, in said writing, jointly do and perform all and singular the acts required by section 55 of the Civil Code of the state of California to constitute a marriage between them, and thereby became and had ever since been husband and wife according to the laws of the state of California; that said claims and pretensions were falsely and maliciously made by her for the purpose of injuring him, the said Sharon, in his property, his business, and his social relations, for the purpose of obtaining credit by the use of his name with merchants and others, and thereby compelling him to maintain her, and for the purpose of harassing him into the payment of large sums of money to quiet her said false pretensions, and for the purpose of harassing and injuring his estate and his true heirs at law and next of kin in the event of his death, and of compelling his heirs at law and legatees to pay her large sums of money to quiet her false and fraudulent claims and pretensions; that the respondent was not and never had been the wife of him, the said Sharon, by a solemnization of marriage, contract, declaration in writing, or otherwise; that they did not, on the day and year alleged, or at any other time, at the place alleged, or elsewhere, jointly, or otherwise, make in writing, or otherwise, the said alleged written contract of marriage; that the respondent claimed to have in her possession said written contract

of marriage, executed as above stated, but that the instrument held by her and claimed to be such contract was false, forged, counterfeit, and fraudulent; that he never made or signed the same or any part thereof, and that the same was null and void as against him, and ought, in equity and good conscience, to be so declared, and ordered to be delivered up to be annulled and canceled.

The substance of the prayer of the bill was, that it be adjudged and decreed that the said Sarah Althea Hill was not and never had been the wife of the said Sharon, and that they did not make the said joint declaration of marriage, or any marriage, between them, and that she be perpetually enjoined from making said allegations, representations, and pretensions of marriage with him, and that said false and forged contract of marriage be decreed and adjudged to be false, fraudulent, and forged, and to be delivered up to be canceled and annulled. There was an answer traversing the material allegations of the bill, and alleging the pendency of this action in the court below. By a supplemental answer, it was shown that the court below had in this action, since the filing of the defendant's answer, filed its findings and decree, wherein it was adjudged that the agreement sought to be canceled in that suit was a genuine contract of marriage between the parties, and that said parties became, by reason of said contract, and other matters, and were, husband and wife.

The circuit court, upon a full hearing of said cause on its merits, entered a decree in favor of the complainant therein, declaring that said pretended declaration of marriage was never executed by said parties, and that the same was false, counterfeited, fabricated, forged, and fraudulent, and as such was utterly null and void, and that the same be delivered up to the clerk of said court to be canceled. Said decree also contained the following: —

"And it is further ordered, adjudged, and decreed that

the respondent herein, Sarah Althea Hill, her heirs, assigns, executors, administrators, and all persons claiming any interest thereunder by or through said respondent, and her and their agents and attorneys, be, and they and each and all of them are, hereby perpetually enjoined from alleging the genuineness or the validity of said instrument, and from making any use of the same in evidence or otherwise to support any right claimed under it, or making any claim, or setting up any right, interest, or claim of any kind, under or by virtue of said instrument or declaration of marriage, either as wife of complainant, or for any interest in property or right of any kind or nature against said complainant, his heirs, executors, administrators, or successors in interest, and that complainant recover his costs of suit." (See *Sharon* v. *Hill*, 11 Saw. 290; *Sharon* v. *Terry*, 36 Fed. Rep. 337.)

This decree was rendered subsequent to the decree of the court below, and has since been revived in the name of the personal representatives of the said William Sharon, now deceased. (*Sharon* v. *Terry, supra.*) In conformity to said decree above mentioned, a writ of injunction has issued out of the circuit court enjoining the respondent, in the language of said decree, from in any way using or asserting any rights under said pretended marriage contract.

The appellant has filed in this court these proceedings in the United States court as a bar to the respondent's rights under the judgment in the court below, and by virtue thereof asks this court to declare the marriage contract a forgery, and give effect to the decree of said United States court.

The kind of judgment to be entered by this court to give effect to said last-named decree is not pointed out in the brief of the learned counsel for the appellant. They assert with confidence that they are entitled to some relief, but what it shall be is left to the court to find out.

The point made and relied upon by the appellant as to this branch of his case is, that the court below and the federal court had equal and concurrent jurisdiction of the subject-matter and of the parties; that the contract declared to be invalid by the federal court is the basis and foundation of the respondent's action now before us, and that the federal court having first taken cognizance of the case, its judgment must prevail over that of the state court, in which the action was commenced at a later day, no matter in which court final decree was first rendered.

This presents for our consideration the somewhat novel and important question, whether this court can, upon undisputed evidence of the facts relied upon by the appellant, step aside from the strict line of its appellate jurisdiction to adjudicate upon the effect of these conflicting decrees.

The general rule undoubtedly is that this cannot be done. This is conceded by counsel for appellant, but they contend that there are exceptions to the rule, and that in extraordinary cases, where, but for the right of an appellate court to look beyond the record on appeal, great wrong and injustice must result, the court will exercise such right.

There are cases which give countenance to this contention, and in which appellate courts have, in furtherance of justice, considered matters *dehors* the record, and acted upon them. (*Poole* v. *Seney*, 70 Iowa, 275; *Waldron* v. *Ely*, 2 N. J. L. 79; *Steelman* v. *Ackley*, 2 N. J. L. 165; *Anderson* v. *Radley*, 3 N. J. L. 1034; *Dakota County* v. *Glidden*, 113 U. S. 222, 226; *United States* v. *Schooner Peggy*, 1 Cranch, 103, 109; *United States* v. *Preston*, 3 Pet. 57; *Yeaton* v. *United States*, 5 Cranch, 281; Smith's Com., secs. 772, 774; *Commonwealth* v. *Duane*, 1 Binn. 601, 608; 2 Am. Dec. 497.) But a careful examination of these cases discloses the fact that the matters brought to the attention of the appellate courts showed

beyond controversy either that the judgments appealed from were invalid or erroneous, and that in case such matters were disregarded by the courts, the parties contending against the judgments appealed from must be left without any remedy if the same should be affirmed. These cases differ materially from the case at bar in both these respects.

If this court should consider the offered evidence, and give it all the weight that is claimed for it by the appellant, it would not prove either that the order appealed from is erroneous or that the judgment rendered by the court below is invalid. The case, as presented by the record on appeal and the offered evidence, is simply this: Conceding that the subject-matter of the two actions was the same, and that the federal court had jurisdiction in the premises, both of which the respondent denies, here are two courts of concurrent jurisdiction, both of which have assumed and are exercising jurisdiction over the same subject-matter and the same parties. The federal court has first taken jurisdiction, but this fact is not called to the attention of the state court in any legal way, and it proceeds to final judgment. Subsequently, the federal court renders a judgment contrary to and in direct conflict with that of the state court. Does this prove that the judgment of the state court is either void or erroneous? Not so. But as a matter of public policy, one or the other of these conflicting judgments must be held to prevail over the other, whether right or wrong; which one is not for us to say. Both of the judgments may be valid, and as they may have been rendered upon different evidence, it may be that neither of them is erroneous. It is purely and solely a question, therefore, as to which one of them shall prevail over the other, and this is a question that cannot be determined on this appeal.

The appellant is not without his remedy. If the order appealed from should be affirmed, and an attempt

be made to enforce it, upon the *remittitur* of this court being sent down, the question as to the force and effect of the two judgments could then be determined by a direct proceeding for that purpose.

We do not regard it as at all necessary to extend this necessarily long opinion by attempting to review and distinguish the above cases cited by counsel, except in the general way above stated. We are quite clear that they do not cover this case.

Counsel have argued at great length the question whether the federal court had jurisdiction in the action before it, and as to the effect of the conflict in the jurisdiction and final judgments of the two courts; but the conclusion we have reached renders it unnecessary for us to consider these questions.

Before passing to an examination of the questions directly presented by the record, it may be well to consider and determine what effect the decision of this court on the appeal from the judgment has upon the present appeal. It is contended by the respondent, that so far as the question as to what is necessary to constitute a valid marriage is concerned, the decision on the former appeal has become the law of the case, and conclusively binding upon this court, as well as upon the parties to the action. In view of this contention, it may be important to ascertain definitely what was actually decided on the former appeal.

As to the acts and conduct of the parties tending to show a valid marriage, the court below found:—

"2. That on the twenty-fifth day of August, A. D. 1880, the plaintiff and defendant each signed a certain declaration of marriage in the words and figures following, to wit:—

"'In the city and county of San Francisco, state of California, on the twenty-fifth day of August, A. D. 1880, I, Sarah Althea Hill, of the city and county of San Francisco, state of California, aged twenty-seven years, do

here, in the presence of Almighty God, take Senator William Sharon, of the state of Nevada, to be my lawful and wedded husband, and do here acknowledge and declare myself to be the wife of Senator William Sharon of the state of Nevada.       SARAH ALTHEA HILL.'

"'AUGUST 25, 1880, SAN FRANCISCO, CAL.

"I agree not to make known the contents of this paper or its existence for two years, unless Mr. Sharon himself see fit to make it known.       S. A. HILL.'

"'In the city and county of San Francisco, state of California, on the twenty-fifth day of August, A. D. 1880, I, Senator William Sharon, of the state of Nevada, aged sixty years, do here, in the presence of Almighty God, take Sarah Althea Hill, of the city of San Francisco, California, to be my lawful and wedded wife, do here acknowledge myself to be the husband of Sarah Althea Hill.       WILLIAM SHARON, Nevada.

"'August 25, 1880.'"

"Which was the only written declaration, contract, or agreement of marriage ever entered into between said parties, and at the time of signing said declaration plaintiff and defendant mutually agreed to take each other as and henceforth to be to each other husband and wife.

"3. That afterwards, and about the —— day of September, 1880, the plaintiff and defendant commenced living and cohabiting together in the way usual with married people, although their cohabitation was kept secret, and so continued for the space of more than one year and down to the twenty-fifth day of November, 1881, and during all of said time the plaintiff and defendant mutually assumed towards each other marital rights, duties, and obligations.

"4. That during the time plaintiff and defendant so lived together, defendant visited her relations with her, escorted her to places of amusement, and introduced her to respectable families and to members of his own fam-

ily, and wrote to her several letters while absent from her, in which he addressed her as 'My dear wife.'

"5. From the foregoing facts, the court finds that plaintiff and defendant intermarried in August, 1880, and that the allegations of paragraphs 2 and 3 of the complaint as to the fact of marriage are true, except in so far as the declaration therein referred to is alleged to be in compliance with section 75 of the Civil Code of this state."

These findings were binding on this court, on the appeal from the judgment, the evidence not being in the record.

Three material facts were distinctly found in favor of the respondent: 1. The execution of the contract; 2. That the plaintiff and defendant, after the execution of the contract, *commenced living together in the way usual with married people;* 3. *That they mutually assumed toward each other marital rights, duties, and obligations.* These findings completely covered the requirements of section 55 of the Civil Code, which provides: "Marriage is a personal relation arising out of a civil contract, to which the consent of parties capable of making it is necessary. Consent alone will not constitute marriage; it must be followed by a solemnization, or by *a mutual assumption of marital rights, duties, or obligations.*"

But the court found one fact favorable to the defendant, viz., *that their cohabitation was kept secret, and so continued for more than one year.* Therefore, the sole and only question presented to this court for decision on the appeal from the judgment was, whether or not, assuming that every act necessary to constitute a valid marriage had been done by the parties, the fact that *one or more of those necessary requirements of the statute had been kept secret would nullify the same and render the same invalid.*

This is clearly demonstrated by some of the language of the prevailing opinion in the case, in which it is said: "The court below found *as facts* that, during the certain

period after the consent to marry, 'the plaintiff and defendant lived and cohabited in the way usual with married people, . . . . and mutually assumed toward each other marital rights, duties, and obligations.' If, as we have said, they might mutually assume marital rights and duties, although their relation was kept secret, the insertion of the words 'toward each other' does not vitiate the finding, and the finding of facts is conclusive on this appeal." (75 Cal. 36.)

Also the following: "Our conclusion is, that the provision of the code requiring a mutual assumption of marital rights and duties to follow consent does not make it indispensable to the validity of the marriage that the relation between the parties shall be made public. The section of the code does not purport to require it. The policy of the common law does not demand it, and the policy of the common law has not been changed by statutory enactment." (75 Cal. 37.)

Also in the concurring opinion of Mr. Justice Temple: "Persons capable of marriage consented to present marriage after they cohabited in the way usual with married persons for more than one year, during which time they mutually assumed toward each other marital rights, duties, and obligations. The cohabitation and supposed marriage was, however, kept a secret, pursuant to an agreement in writing made at the time of the mutual consent to present marriage." (75 Cal. 49.)

Doubtless much was said in the opinions on that appeal that was unnecessary to a decision of the question presented, but the point raised was clearly defined, and cannot be misunderstood.

We have said this much in order to show that nothing was then decided that can in any way interfere with or prevent a full and fair consideration of the questions presented by this appeal.

The decision there was, that the findings supported the judgment. The main question presented here is, whether

or not the findings are sustained by the evidence. In other words, Is the evidence sufficient to show that the parties did execute the contract, live and cohabit together in the way usual with married people, and mutually assume toward each other marital rights, duties, and obligations? And in the consideration of these questions of fact, as we shall see further on, the fact of secrecy, found by the court below, must become a most important element in determining whether their cohabitation was such as is usual with married people, and whether they did mutually assume toward each other marital rights, duties, and obligations.

But lest a discussion of the questions arising here may result in a conflict between the former decision and the present one, we prefer to meet and decide the question whether the doctrine that a decision once made in an action is forever after the law of the case is applicable to this case in its present *status*.

In support of the contention that the former decision is binding upon us here, counsel for respondent say: "The validity of the contract of marriage set forth in the findings was directly involved in and directly adjudicated on that appeal, and no question concerning its validity can now or hereafter be agitated in this court"; and cite, as supporting this position, *Gwinn* v. *Hamilton*, 75 Cal. 265; *Reclamation District* v. *Goldman*, 65 Cal. 636; *Clary* v. *Hoagland*, 6 Cal. 685; *Davidson* v. *Dallas*, 15 Cal. 75; *Mulford* v. *Estudillo*, 32 Cal. 131; *Jaffe* v. *Skae*, 48 Cal. 540; *Donner* v. *Palmer*, 51 Cal. 636; *Megerle* v. *Ashe*, 47 Cal. 632; *Heinlen* v. *Martin*, 59 Cal. 181; *Doyle's Appeal*, 73 Cal. 570.

We have shown above that counsel are mistaken in their statement that the former decision directly adjudicated upon the validity of the contract of marriage as now presented. It did determine the validity of the contract as presented by the findings of the court below.

The authorities cited sustain the general and well-

established rule that a question presented and decided by an appellate court becomes thereafter the law of the case and a guide in all subsequent proceedings therein, and that the rule is binding on the appellate court if the case again comes before it after having gone down to the lower court for further proceedings, the facts on the second appeal being the same as on the first. The reason of the rule is apparent. This court having declared the law, and the parties and the court below having acted upon it, as a matter of policy, the law as thus declared and acted upon, whether right or wrong, cannot afterward be changed. But for this salutary rule, litigation might go on indefinitely, to the great detriment, not only of the parties concerned, but of the public.

But we are clear that the reason of the rule does not apply here, and that where the reason does not exist the rule itself is not applicable. The law of this state permits two appeals in the same case, one from the judgment, and the other from the order denying a new trial. Both of these appeals have a direct effect on the judgment, and if successful, may vacate it entirely or modify it, as the court may determine. These appeals may both be prosecuted and be pending in this court at the same time, as was the case here until the appeal from the judgment was disposed of. The fact that this court has declared a rule of law in deciding the appeal first reached for decision, and upon which no action has or can be taken until the second appeal is also disposed of, cannot, by reason of the rule invoked by the respondent, prevent the court from fully investigating and deciding the second appeal to the extent of modifying or wholly changing its former decision, if it be satisfied that an error has been committed. The case must be regarded as within the control of this court until both appeals are determined.

See, as bearing on the point that the disposition of one of the appeals allowed by the statute does not affect the rights of the party under the other, *Fulton* v. *Hanna*,

40 Cal. 278; *Walden* v. *Murdock,* 23 Cal. 548; 83 Am.
Dec. 135; *McDonald* v. *McConkey,* 57 Cal. 325.

The rule has no application where the facts presented
on the second appeal are materially different from those
on which the decision was rendered. (*Nieto* v. *Carpenter,*
21 Cal. 454; *Meeks* v. *Southern Pacific R. R. Co.,* 56 Cal.
513; 38 Am. Rep. 67; *Cross* v. *Zellerbach,* 63 Cal. 623;
*Dodge* v. *Gaylord,* 53 Ind. 365.)

We come now to an examination of the points made
by the appellant on the merits.

The first point is, that the finding that the alleged mar-
riage contract was executed by the defendant is not sus-
tained by the evidence.

There is direct and positive evidence in support of this
finding, which brings the case clearly within the well-
established rule that where there is a substantial conflict
in the evidence this court will not disturb the finding.

The second point is, that the evidence does not sustain
the finding that "*the plaintiff and defendant commenced
living and cohabiting together in the way usual with married
people, although their cohabitation was kept secret, and so
continued for the space of more than one year,*" and that
"*during all of said time the plaintiff and defendant mutu-
ally assumed toward each other marital rights, duties, and
obligations.*"

Both of these branches of the finding complained of
will be examined together, and in order to consider the
evidence and apply the law thereto in such way as to be
understood, it becomes absolutely necessary to set out
the material facts which the evidence in favor of the re-
spondent tends to prove, and a part of the evidence itself,
which might otherwise be profitably omitted.

The alleged marriage contract bears date August 25,
1880, and the respondent claims that it was executed as
of that date.

The contract itself contains a stipulation on the part
of the respondent that she will keep its contents a secret
for two years.

Giving full faith and credit to the respondent's evi-
dence in support of these findings, it appears that the
contract was written by her at the dictation of Mr.
Sharon, and signed by them; that upon the contract
being signed, they immediately separated, she going to
the Galindo Hotel, in Oakland, and he to Virginia City,
Nevada.

Soon after, and before Mr. Sharon's return, the Galindo
Hotel was destroyed by fire, and the respondent removed
to the Baldwin Hotel, in San Francisco.

It does not appear that there was any communication
between the parties during his absence at Virginia City.
He returned a few days before the 25th of September,
which was just after the respondent had removed to the
Baldwin.

On the 25th of September he wrote her several notes,
sent by a private messenger. They were as follows:—

"*My dear Allie*,—Can you see me in the parlor of the
Grand at five o'clock? Want to put you on your guard
about some matters. Answer. Yours,

"WILLIAM SHARON.

"Monday, September 25, 1880."

"PALACE HOTEL, SAN FRANCISCO,
"September 25, 1880.

"*My dear Miss Hill*,—Can you meet me this evening,
say about five o'clock, in parlor of the Grand Hotel?
Something I want to tell you about, of interest to your-
self. Will not do to meet you at the Baldwin; so if you
cannot see me at the Grand, name a place and hour.

Very truly,    WM. SHARON."

"PALACE HOTEL, SAN FRANCISCO,
"September 25, 1880.

"*My dear Allie*, — There are reasons why I should
not call. But as we have tried to meet, and failed, will
call in twenty minutes after you get this, and explain.

Yours,    W. SHARON.

"Will call at your room."

The respondent testifies that he had called to see her before the 25th, when these different letters were written, "nearly every evening and every afternoon; he was there constantly"; that upon his visit after sending the last above note, he said there was no use talking, she must leave the Baldwin and go either to the Palace or the Grand; that his coming there and being with her so much created a good deal of comment; that some parties were going to attempt to put up a job on them so as to expose them, and he would have to come out and acknowledge the marriage. He accordingly gave her a letter to Mr. Thorn of the Grand, as follows:—

"*My dear Sir,*—The bearer, Miss Hill, a particular friend of mine, and a lady of unblemished character and of good family, may want rooms. Give her the best, and as cheap as you can, and oblige,

"Sept. 25, 1880."                              "WM. SHARON.

She accordingly took rooms at the Grand. Mr. Sharon, she says, was away a good deal of the time following, but when in the city he had rooms at the Palace Hotel, and she at the Grand. He paid for the furniture to furnish her room, and money with which to pay her expenses, amounting to five hundred dollars a month, as agreed upon between them. She visited him at his rooms, sometimes taking meals with him there, sometimes spending the evening or the night with him. She at one time, when he came down from Virginia City, gave a musicale for him at her rooms, to which a number of persons were invited and were present. Whether the guests knew the musicale was given for him or not does not appear. She at one time went with him to his place at Belmont, near the city, taking a lady friend with her, she says, for the reason that "I did not care to go down alone, as it was not known that we were married."

She visited Belmont at several different times subsequently, but always in company with others, never with

LXXIX. CAL.—42

him alone. At some of those times, she says, she went to assist him in entertaining company.

The following are some of his invitations to her to take meals with him:—

"*My dear A.,*—Come and take dinner. Answer."

"*Miss H.,*—Have ordered a nice dinner, and have a sample bottle of wine I want you to try."

"*My dear Allie,*—Come over and join me in a nice bottle of champagne, and let us all be gay before Christmas.

"December 21, 1880."

She was invited to and attended a general reception given at the marriage of his daughter, and was given blank invitations by him to fill up and send to her friends. She testifies in general terms: "During the fall of 1880 down to the time Mr. Sharon went East, I spent my nights with Mr. Sharon in his own apartments at the Palace Hotel. I used to go everywhere with Mr. Sharon. He scarcely went anywhere that I did not go with him,—either riding or driving, or attending to business, or going to Oakland on business, that he did not take me with him."

He frequently introduced her to friends and acquaintances, but always as Miss Hill. The court below found that he "never introduced her as his wife, nor spoke to her as such in the presence of other persons."

There were certain letters purporting to be from him to the respondent, and which she says were written by him, addressed, "My dear wife." They were as follows: —

"*My dear Wife,*— In reply to your kind letter, I have written Mr. Thorn and inclosed same to you, which you can read, and then send it to him in an envelope, and he will not know that you have seen it. Sorry that anything should occur to annoy you, and think my letter will command the kind courtesy you deserve. Am hav-

ing a very lively and hard fight.    But think I shall be victorious in the end.

"With kindest consideration, believe me, as ever,

"WM. SHARON."

"*My dear Wife,*— Inclosed find $310 to pay bills with, etc.                                                    W. S.

"August 29, 1881."

"*My dear Wife,*— Inclosed send you by Ki the balance, $250, which I hope will make you very happy. Will call this evening for the joke.    Yours,        S.

"April 1st."

"PALACE HOTEL, SAN FRANCISCO,
"October 3, 1881.

"*My dear Wife,*— Inclosed $550, which will pay expenses till I get better.    Will then talk about your eastern trip.    Am much better to-day; hope to be up in three or four days.                  Truly,            S."

About the 24th of August these parties began to have difficulty.    He charged her with having abstracted some of his papers, which she denied, and she testifies he demanded her signature to a paper to the effect that she was not Mrs. Sharon, and agreeing to pay her five hundred dollars a month for life, which she refused to sign. She was then turned out of the rooms of the Grand Hotel, under instructions from him.    This was in December of 1881.    In connection with her removal from the hotel she wrote the following letters to him, which throw light upon the relations the parties then bore to each other:—

"*My dear Mr. Sharon,*— I have written you two letters and received no reply, excepting to hear that they have been read & commented upon by others than yourself.    I also hear you said you were told that I said I could and would give you trouble.    Be too much of a man to listen to such talk, or allow it to give you one moment's thought.    I have never said such a thing or

have I had such a thought. If no woman ever makes you any trouble until I do, you will go down to your grave without the slightest care. No, Mr. Sharon, you have been kind to me. I have said I hope my God may forsake me when I seise to show my gratitude, & I repeat it, I would not harm one hair of your dear old head, or have you turn one restless night upon your pillow through any act of mine. If you are laboring under a mistake and not bringing the acquisition for the purpose of quarreling with me, the time will come when you will find out how you have wronged me, & I believe you too much of a man at heart not to send for me & acknowledge it to me. But in your anger you are going to the extreme. I have no way of proving to you my innocence, but God knows I am innocent, as much so as your own daughter, who is now in England. But when I say you are going to the extreme, I mean by calling Thorn or any of your relatives or outsiders and letting them know of your anger,— it simply gives them an opportunity of saying ill-natured things of me which are unnecessary."

" Mr. Sharon, I have never wronged you by word or act, and were I to stay in this house for a thousand years I should never go near your door again until you felt willing to say to me you had spoken unjustly to me. You once said to me, ' There was no woman that could look you in the face & say, William Sharon, you have wronged me.' If that be the case, don't let me be the first to utter the cry. I had hoped to always have your friendship & best will throughout life, and always have your good advice to guide me, & this unexpected outburst, & uncalled for actions was undeserved. If you would only look at how absurd and ridiculous the whole thing is, you surely would act with more reason. Why should I do such a thing? What was I to gain by doing so? Pray give me credit for some little sense. I valued your friendship more than all the world. Have I not

given up everything and everybody for it, & one million of dollars would not have tempted me to have risked its loss. I feel humiliated to death that Thorn or any one else could have it to say I was ordered out of the house. I have a world of pride, & I ask you to at least show me the respect to let Thorn have nothing more to say or do in the affair. I have always been kind to you, & tried to do whatever I could to please you, & I hope, at least, in your unjust anger you will let us apparently part friends, & don't do or say anything that could create or make any gossip. Think how you would like one of your daughters treated so. If you have any orders to give, or wish to make known, make them known in any other way than through your relatives or through Thorn. Don't fight me. I have no desire or wish to in any way be unkind to you. I have said nothing to any one about the letter I have received, nor do I wish to even speak to Thorn on the subject. You have placed me in a strange position, Senator, & all the pride in me rebels against speaking upon the subject. I have been looking at some very nice places, but I cannot get them until some time during the coming month. If you still desire me to go away, make it known to me, & I will obey you.          As ever,      A."

"PALACE HOTEL, SAN FRANCISCO, ——, 188-.

"*My dear Mr. Sharon*,—I cannot see how you can have any one treat me so — I, who have always been so good and kind to you — the carpet is all taken up in my hall — the door is taken off and away—and it does seem to me terrible that it is you who would have done — I met Mr. Thorn in the hall as I started to come over to see you, and asked him if you had ordered such a thing done—& he said that I must move out; that it was your wish—I told him that I had written you a note when I received his, and told you if you wished me to go to send me word — for it was not convenient to get the place I wanted until some time in this month—he said that

you had told him to see that I went — so I said no more, but came over to see you — Ah, Senator, dear Senator, do not treat me so — whilst every one else is so happy for Christmas, don't try to make mine miserable — remember this time last year — you have always been so good, don't act so — now — let me see you and talk to you — let me come in after Ki has gone, if you wish — & be to me the same Senator again — don't be cross to me — please don't — or may I see you, if only for a few minutes — be reasonable with me, and don't be unjust — you know you are all I have in the world — & a year ago you asked me to come to the Grand — don't do things now that will make talk — you know you can find no fault with me — may I see you for a few minutes & let us talk reasonably about all this — I know you will — I know it is not in your nature to be so hard to one that has been so much to you — don't be unjust — Say I may see you."

"*Mr. Sharon,*— I received a letter from Mr. Thorn in regard to my room. Of course I understand it is written by your orders, for no human being can say aught of me except with regard to yourself. Now, Mr. Sharon, you are wronging me; so help me God, you are wronging me. I am no more guilty of what you have accused me than some one who never saw you, and would you, who asked me to come to this house, whom I have been up with nights, and waited on and cared for, and would have done anything on earth to help you, be the one to wrong and injure me,— a man whom the people have placed enough confidence in his honor to put him in the United States Senate, to stoop to injure a girl, and one whom he has professed to love? Is—"

From the way this letter terminates a part of it must have been missing.

She took up her residence at a private house after leaving the Grand, and during the summer of 1882 they seem to have adjusted their difficulties to some extent,

and she again visited him at his rooms, but there is nothing in these visits tending in any way to strengthen the respondent's case.

At one time she secreted herself and saw Sharon and another woman undress and go to bed together in his room, and afterward told it as a laughable joke, and this at a time when she testifies she was his wife.

Again, at another time, evidently when she began to think it necessary that she should have some proof of her intimacy with him, she secreted a young girl, not yet twenty years of age, and who seems then to have become a kind of confidant of hers, behind the bureau in his room to see Sharon and herself go to bed together, and hear what was said, and the girl remained there until they had retired, and he had fallen asleep, and then crept out of the room.

The defendant testified positively that the relation of husband and wife never existed between him and the plaintiff; that she was his mistress, for which he agreed to and did pay her five hundred dollars a month; that the alleged marriage contract was never signed by him, and that he never addressed a letter to her as "My dear wife," and there was evidence strongly tending to show that the contract and addresses to these letters were forgeries.

It seems to us that this evidence shows conclusively that these parties did not live and cohabit together "in the way usual with married people." They did not *live* or *cohabit* together at all. They had their separate habitations in different hotels. Her visits to his room and his visits to hers were occasional, and apparently as visitors. They had no common home or dwelling-place. This did not constitute a living together or co-habitation. (*Yardley's Estate*, 75 Pa. St. 207; *Ohio* v. *Connoway Township*, Tapp. 58.) Their acts and conduct were entirely consistent with the meretricious relation of man and mistress, and almost entirely

inconsistent with the relation of husband and wife. It may be said that the public manner in which he received her and introduced her to his friends was inconsistent with his claim that she was his mistress, and not his wife. This might be so with some men, but the record before us bears unmistakable evidence of the fact that this man had sinned so long and so openly in this respect that he did not care to conceal his wrong-doing even from his own family. Beside, it must be remembered that there was nothing openly improper in their relations in connection with their association with other persons. She was received and treated as a mere lady friend and acquaintance, and not otherwise. That any greater intimacy existed between them than would have been proper as between friends of the opposite sex was carefully concealed from the public.

Again, it may be said that this branch of the finding was immaterial; that it was not a question whether they had lived and cohabited together in the way usual with married people, but whether or not they had mutually assumed marital rights, duties, and obligations; and although this point is not directly made by the respondent, we are inclined to that view, except so far as it was necessary to show cohabitation, or a living together as husband and wife, in order to sustain the other branch of the finding, and for that reason pass to the real question in the case, viz., whether the evidence was sufficient to sustain the finding that they "*mutually assumed toward each other marital rights, duties, and obligations.*"

The contentions of opposing counsel on this important question turn mainly upon the understanding they have as to what is necessary to constitute the mutual assumption required by the statute, and their views of the statute are radically different, and in our opinion the construction claimed by each of the parties is strained and unwarranted.

The position of the appellant is, that to constitute a

mutual assumption of marital rights, duties, or obligations it is not sufficient that such rights, duties, and obligations be fully and mutually assumed by the parties, *as between themselves*, but that they must be *openly* and *publicly* assumed.

This is based on the theory that this mutual assumption is intended by the statute to take the place of a solemnization of the marriage, and must be such as to furnish evidence on the part of third parties, who are disinterested, of the fact of marriage.

We can easily conceive of a case where parties have fully assumed all of the rights, duties, and obligations of husband and wife in such way as to fill the requirements of the statute without making known the fact to the public, yet without any direct act of concealment or any intention to conceal their true relation toward each other.

For example, if a couple should consent to marriage as the statute requires, and take up their abode in some place uninhabited as yet by others, and live openly and in good faith as husband and wife in the way usual with married people, we are quite clear that it could not be said that because of the fact that their assumption of the rights and duties of husband and wife was unknown the marriage should be held to be invalid.

The contention of the respondent is thus expressed in her brief: "We repeat, the first mutual act, be it of sexual commerce or the assumption of any other right, duty, or obligation, of the marital relation, after the execution of the written contract of marriage, instantly establishes the relation of husband and wife."

The exigencies of her case drive her to this position. If it cannot be upheld, the conclusion reached by the court below must inevitably be wrong.

Let us see to what this would lead us. It means, supposing a case, that where a couple are associated together in the meretricious relation of man and mistress, and in

the habit of meeting occasionally, solely for the purpose of gratifying their passions, and while so connected they *consent*, no matter how informally, to marry, and thereafter continue to live precisely as before, the mere fact that sexual intercourse, under such circumstances, follows after the consent amounts to a mutual assumption of marital rights, duties, and obligations, and from that time they are husband and wife. It means, therefore, that, in some cases at least, this requirement of the statute amounts to nothing. It means that a couple may consent to marry, may live precisely as if they are unmarried and their relations meretricious; to the world they may appear to be unmarried, and their children, if they have any, appear to be bastards; if they conclude to violate their "consent" to marriage, they may go their ways; that they were husband and wife cannot be proved, and their children are bastards indeed. We cannot so far reflect upon the law-making power as to hold that such was their intention. The case before us presents the strongest possible argument against this construction. Take the respondent's statements to be true in every respect. She entered into this contract believing it constituted a legal marriage. She consented to conceal from the world her true relation to the defendant and place herself in a position that might, and if she should be detected in the act of treating him as a wife would, inevitably brand her as his mistress. He could deny her, and she would be helpless, and her character would be ruined. On the other hand, such a construction would enable a designing and unprincipled woman to impose herself on a man as his wife without right and against his will. We think just such results were intended to be prevented by the statute we are considering, and that in requiring that they should assume marital rights, duties, and obligations, it was clearly intended that they should so conduct themselves toward each other

as to give evidence to those with whom they might come in contact that they were husband and wife.

With these general observations we notice some of the authorities relied upon by counsel.

Counsel for respondent cite no authorities in favor of their position, and dismiss the question, so important to their client, in a general statement of their views, covering three pages of their brief.

The New York code, from which ours was taken, did not contain the clause we are considering. (N. Y. Code, sec. 34.) It must be assumed, therefore, that by the change made our legislature intended to add something more to the contract of marriage than was necessary under the New York code.

Section 35 of the New York code and section 57 of our own do not relate to what shall be necessary to constitute a valid marriage, but to the manner in which it shall be manifested and proved. Section 36 of the New York code and section 56 of our own provide who shall be capable of marriage. It is said in the prevailing opinion on the former appeal that "consummation," as used in sections 56 and 57 of our code, means "simply sexual intercourse, — copulation, — nothing more nor less." If this be conceded, it is unimportant, as section 55 does not use the term. If it had been intended to prove that mere consummation, in the sense indicated, following consent should amount to marriage, no doubt this well-defined legal term would have been used as it was in the following sections. That it was not used is amply sufficient to show that the legislature intended that something more than mere consummation by copulation should be required. As to what the meaning of the language is, we quote with approval the following language in the dissenting opinion of Mr. Justice McFarland on the former appeal:—

"Again, what plainer and more obvious construction can be put upon the language in question than to say

that the legislature meant by it that kind of conduct which generally, and we might say universally, characterizes married people who *have* assumed marital rights, duties, and obligations? The legislature must be presumed to have had that common knowledge which all people have of the familiar and habitual social customs of the country with respect to the marriage relation, and of the usual deportment of persons who have assumed that relation. Now, can it be pretended that married people usually (or at all) refuse to recognize each other as husband and wife in the presence of others; that they never speak of each other as husband and wife; that they never so live together that their residence, however humble,—though it be but a room in a garret,—is the recognized home of a family, with its usual relations and associations; that they so carefully guard their conduct that they are never reputed or even suspected among their acquaintances and friends to be husband and wife; that they never indulge in any deportment whatever that would intimate in the slightest way to any human being, except themselves, that they were married? It seems difficult for any human understanding not too much swayed by artificial distinctions and attenuated niceties to receive such conduct as an assumption of marital rights, duties, and obligations. What marital rights has a woman 'assumed' who could not even protect herself against apparent shame by asserting the honorable name of wife? What marital obligations of protection can a man fulfill toward a woman whose wifehood he publicly repudiates? And how can society enforce its rights in a relation of which it can have no knowledge, and of the existence of which it has no grounds of suspicion? And what of the children, if any, of such a marriage? Is there to be no one whom they can call 'father' or 'mother'? And what possible protection could there be against fraudulent pretenses of marriages,

made, perhaps, for the first time after the deaths of alleged husbands or wives?"

We may gather from common-law rules and the decisions of the courts of other countries and states some idea as to what has been regarded as requisite to a valid marriage, but the language of our code is peculiar and stands alone. Whatever may have been the common-law rule on the subject, the express language of the code must control if we can ascertain its meaning. But, certainly, if consent and consummation by sexual intercourse were sufficient to constitute marriage at common law, it clearly appears to have been the intention of our legislature to change that rule and require something more.

But where proof of marriage depends on the conduct of the parties toward each other, authorities are ample to show that the evidence in this case was wholly insufficient to prove such marriage.

Cohabitation, which is evidence of the assumption of marital rights, duties, or obligations, must be a "living together as husband and wife." (*Cannon* v. *United States,* 116 U. S. 55; *Calef* v. *Calef,* 54 Me. 365; 92 Am. Dec. 549; *Yardley's Estate,* 75 Pa. St. 211; 1 Bishop on Marriage and Divorce, sec. 777, and note; 3 Am. & Eng. Ency. of Law, 308; 2 Com. Dig. 194; *Clark* v. *Cassidy,* 64 Ga. 662; *Post* v. *Post,* 70 Ill. 488.)

At common law, and under statutes authorizing marriage by consent without formal ceremony, if the parties agree presently to take each other for husband and wife, and from that time live together *professedly in that relation,* proof of these facts is held to be sufficient to constitute marriage. (*Hutchins* v. *Kimmell,* 31 Mich. 126; 18 Am. Rep. 164; *Teter* v. *Teter,* 101 Ind. 134; 51 Am. Rep. 742.) Certainly nothing less than this can be held to be sufficient under the latter clause of section 55. The proof of the contract is not enough. There must be evidence sufficient to show that they *assumed* the relations of husband and wife, which calls for the same degree of proof,

if cohabitation be depended upon, as was required at common law to establish the marriage.

In our judgment, sexual intercourse is not necessary to the validity of a marriage of the kind we are considering. If the parties agree to marriage, and commence to dwell together, in pursuance of the contract, as husband and wife, they have assumed marital rights, duties, and obligations, and are legally married, although sexual intercourse is not had until later, or not at all. The commencement of true and open matrimonial cohabitation, under such an agreement, is a mutual assumption of marital rights, duties, and obligations, while mere copulation without such cohabitation is insufficient.

The courts have used the word "consummation" generally as the completion of the marriage relation, and not necessarily as the act of sexual intercourse. (*Clayton* v. *Wardell*, 4 N. Y. 238; *Lewis* v. *Ames*, 44 Tex. 341; *Bashan* v. *State*, 1 Yerg. 193; *Clark* v. *Cassidy*, 64 Ga. 662; *Newberry* v. *Brunswick*, 2 Vt. 160; 19 Am. Dec. 703; *Robertson* v. *Cole*, 12 Tex. 363.)

And even where a marriage *per verba de futuro cum copula* is allowed, the marriage does not become consummated by copulation unless the parties so intend (*Peck* v. *Peck*, 12 R. I. 488; 34 Am. Rep. 702; *Stoltz* v. *Doering*, 112 Ill. 234; *Hebblethwaite* v. *Hepworth*, 98 Ill. 126); and where the fact is to be established by the conduct of the parties, under a statute like ours, the copulation must be under such circumstances as to give evidence of the fact that it is not illicit. Under our statute, two things must be proved to constitute a marriage, viz., the contract, and the mutual assumption of marital rights, duties, and obligations. The proof of one of these cannot establish the other. Therefore the assumption required must be proved by something more than copulation, and nothing less than cohabitation in the manner above stated will establish the necessary fact, where it depends for its proof upon the acts and conduct of the parties toward each

other and the public.   (*Hebblethwaite* v. *Hepworth*, 98 Ill. 126.)

· In the light of the statute and these authorities, does the evidence sustain the clause of the finding under consideration?   Cohabitation is evidence from which marriage may be presumed. (1 Fraser on Husband and Wife, 391.)   So the presumption that parties have assumed marital rights, duties, and obligations toward each other, under the statute, may be established by like evidence.   But by what stretch of judicial interpretation of the statute — upon what rule of evidence or of common sense — can it be held that parties *assume* a relation by uniformly and persistently *denying* it? or upon what principle of law or evidence can it be presumed that parties are husband and wife from evidence that they have lived as single and unmarried people, and held themselves out to the world as such?

These parties had no common·home or place of abode; they held themselves out to their relatives, friends, acquaintances, and the world as unmarried. · The respondent never, at any time, assumed the name of her alleged husband.   There is nothing to show that they had taken upon themselves the mutual duties and obligations of the sacred and confidential relation of husband and wife.   Their private·letters and notes, with the single exception of the addresses "My dear wife" on some of them, which are so vigorously attacked as forgeries, do not contain a single word indicating that such a relation existed between them,—no mention of it, no reference to each other as husband or wife, no words of affection or endearment,—nothing that one might expect to find in communications between husband and wife.   But the strongest and most conclusive evidence to our minds that no such relation existed, or was supposed by the respondent to exist, is presented by her letters to him when she was about to be turned out of doors at his instance.   She appeals to his *friendship*, but not to his love or to his

duties and obligations as a husband. She pleads her service to him as a friend and as a nurse, but not as a wife. No claim of her right to his protection; no assertion of her rights as a wife. It is past all belief that any woman could have passed through an experience so bitter and humiliating, and allow herself to be thrust into the street by her own husband, and in her many appeals to him make no mention of the relation that existed between them.

We are clear that the evidence was insufficient to sustain this finding. It is not a question of the weight of the evidence, but whether, giving full credit to it, it proves the assumption by these parties of marital rights, duties, and obligations. It is a question of law, and not of fact, and as matter of law, we hold the evidence to have been insufficient.

The appellant contends that the court erred in allowing the respondent to prove by the witness Martha Wilson that the respondent, in October, 1880, exhibited to her the alleged marriage contract, and the conversation that occurred between them at the time with reference to it. The evidence of the existence of the paper at the early date mentioned was competent. It at least tended to show that it had not been forged subsequent to the commencement of difficulties between the parties when the temptation to manufacture evidence would seem to have been the strongest. As to the conversation, it consisted of a statement that the respondent had requested the witness to keep secret the fact that she had seen the paper. We cannot see how the defendant could have been injured by this. The evidence that the respondent was attempting to keep the contract a secret tended to show that the writing was a forgery, rather than that it was genuine, and that the contract, if genuine, was not made in good faith, and for that reason could not amount to a sufficient basis for the alleged marriage. Therefore the ruling was harmless.

Another female witness for the defendant was asked by the plaintiff, on cross-examination: "How many gentlemen have you gone with beside your husband, when your husband was not present, to the California House and taken luncheon?" in connection with which plaintiff's counsel proposed to show "that this lady is in the habit of visiting houses that are not reputable, and a good deal more, even, than that."

The question was objected to on the ground that it was irrelevant, immaterial, and incompetent. The court overruled the objection. This ruling was erroneous, and the statement of counsel in connection with it was improper. A witness cannot be impeached by evidence of particular wrongful acts, nor is it proper to question the witness with reference to such matters. (Code Civ. Proc., sec. 2051; *Hinkle* v. *San Francisco etc. R. R. Co.*, 55 Cal. 627; *People* v. *Hamblin*, 68 Cal. 101; *Commonwealth* v. *Shaw*, 4 Cush. 593; 50 Am. Dec. 813.) But the witness was not required to and did not answer the question, and therefore the ruling resulted in no injury. The answer of the witness, if given, might have shown that she had been guilty of no wrong or impropriety.

A witness having testified favorably to the defendant, on cross-examination by the plaintiff testified that her husband was dead; that he had left a will, of which she was the sole legatee; that he died of paralysis and softening of the brain, and that she could not tell the exact state of his mind. Whereupon the following occurred:—

"Q. Was he of sound mind? Did you consider him of sound mind when he made his will?

"*Counsel for Plaintiff.*—I object to it on the ground that it is irrelevant and immaterial.

"*The Court.*—You may ask whether at the time he made the will he was imbecile, and that she went into the court and said that he was of sound mind.

"To which ruling defendant's counsel then and there duly excepted.

" *Counsel for Defendant.* — Q. Did you not, at the time he made that will, know that he was not in a sound and disposing mind, and able to make a will ?

"A. When my husband made that will he was sick.

"Q. Did not you know when your husband made that will that he was utterly unable to take care of himself, and of weak mind and unable to make a will ?

"A. Yes, I did. I was the executrix and sole devisee in that will. I do not know that when that will was admitted to probate I swore that he was of sound mind. I said whatever my lawyers told me to say; I never read a single paper."

. This evidence could have been offered for no other purpose than to impeach or discredit the witness, and for that purpose, or any other, it was clearly incompetent and immaterial. As we have said above, a witness cannot be impeached, on cross-examination or otherwise, by proof of specific wrongful acts. The matter about which she was questioned was entirely foreign to the case, and was wholly immaterial, except to discredit the witness and thereby break the force of her testimony. Counsel for respondent contend that the questions following the statement of the court as to what the plaintiff might ask were not objected to, and therefore no question is presented for our consideration. The first question which was improper was objected to. The court then stated, *in reply to the objection*, just what the plaintiff might ask, to which the defendant excepted, and the improper questions, authorized by the court in advance, were asked and answered. It was not necessary for the defendant to renew his objections to the questions as they were asked, so long as they were within the direction of the court as to the extent to which the examination might go.

Again, it is claimed that the right to refuse to answer the question was a personal privilege of the witness, and that the questions could not be objected to by the de-

fendant. But this point has no merit. The weight which should be given to the testimony of the witness was a question in which the defendant was interested. He had the right to object to any questions on cross-examination which tended to weaken the evidence of the witness on direct examination, and which were improper, without reference to the question whether the witness might also refuse to answer on the ground of privilege. If the questions had been pertinent, the right to object to them or refuse to answer would have rested with the witness alone. (*Clark* v. *Reese*, 35 Cal. 89, 95.) But the question here was not pertinent, and for that reason was subject to the objection of the party.

A witness, being called for the defendant, testified that he was an attorney at law, and said further: "I know Miss Hill. I have seen her in this court-room, and I met her once before; that was a year ago, on the corner of Montgomery and California streets. She was with Mrs. Samson. I had two conversations previous to that in the same month of March, a year ago, with Mrs. Samson. At that time Mrs. Samson introduced me to Miss Hill. She said: ' This is the lady I have spoken to you about, that desires to bring an action against Mr. Sharon for breach of promise of marriage.' Now, the plaintiff here, if this was the lady, she had a veil on. I never saw her before or since, until I came here in this court-room. Mrs. Samson said she had fifty letters. I told her three or four letters — good square promises from old Sharon — was all I should want. She said she hadn't time to look over them, but she would in a few days; and I told her when she got ready, to come into my office and fetch the papers with her. The ladies were coming down from Montgomery Street, from the north going south, on the west side of the street, and after the conversation I passed on. It was, I suppose, about four o'clock in the afternoon. This was in March, 1883, — about the 28th or 29th of March."

And on cross-examination he testified: "I do not re-member how she was dressed. She had a dark veil on at the time, and I don't swear positively that that is the woman, but I believe this is the lady. I did not see her face except through the veil. I was admitted to practice in the supreme court of this state a year and a half ago. At the time of the conversation referred to I was a law-yer. I was not her lawyer. If she had employed me instead of you, then, of course, I would have been in a different position. She employed you instead of me. . . . . When Mrs. Samson introduced me to the lady, who was veiled, she said, 'This is the Miss Hill,' and I think I bowed to the lady, and the other conversations. Mrs. Samson spoke about, which you did n't want to hear, and this lady said, 'Well, I have fifty letters from Mr. Sharon.' I told her all I wanted was three good square letters that had a good square promise. The re-ply that she made was that she had n't yet looked over her letters sufficiently, but that she would come back in a few days. This is the last I saw of her. I never saw her since until I saw her here in this court-room. I can-not say that the statement that I made to her about the three letters was advice given her as a lawyer, because I was not her lawyer. Mrs. Samson brought this lady to me for the purpose of making her a client, and I had a talk with her with the understanding that she was to get these letters, select the three with the promises in them, and bring them to me. I understand it to be the duty of a lawyer to keep secret what he hears from his client; but I do not understand it is the duty of a lawyer, if he is called upon to testify in court, that he can claim his privilege as a lawyer to testify to anything he hears from anybody who is not his client, and not given to him in a confidential manner. . . . . I think Mrs. Samson first spoke to me about the case about the 18th or 19th of March, in front of the Nevada Bank, or somewhere along there. She asked me how I was getting along.

She says, 'I have got a case for you that there is one hundred thousand dollars in; do you want to make it?' I said, 'Yes.' She said, 'You will have to furnish some money; have you got any?' I said, 'I have got six thousand or seven thousand dollars in this bank; if it is a legitimate case I want it.' 'Well,' says she, 'it is.' I says, 'What is it?' Says she, 'It is a breach of promise case against Mr. Sharon.' I said, 'O, is that all?' She said it was, and I met her again. The next time I met her she said, "Well, what do you think of that case now?' I said, 'I never gave it a thought.' She said, 'I am going to fetch the lady down.' I said, 'All right; fetch her down.' The next time I met her was on the sidewalk in front of my office. I did not take her up into my office. I had never met Miss Hill before?"

The plaintiff then moved to strike out the whole of the testimony of the witness, "on the ground that it was a privileged communication, and that he had no right to disclose it," and the motion was sustained, and the evidence stricken out, to which the defendant excepted.

This ruling was erroneous, for two reasons. It was not shown that the witness was the attorney for the plaintiff, or that the communication was confidential if he had been. The witness testifies positively that he was not her attorney, and the facts testified to by him show that he was not. And the communication that took place was on a public street, and in the presence of and mostly with a third party, and was not, for that reason, in any sense confidential, or in the course of his employment.

The code provides: "An attorney cannot, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon, *in the course of professional employment.*" (Code Civ. Proc., sec. 1881.)

The burden is upon the party seeking to suppress the evidence to show that it is within the terms of the stat-

ute. (*Earl* v. *Grant*, 46 Vt. 113; Weeks on Attorneys, sec. 147.) And it must appear that the witness learned the matter in question only as counsel, or attorney, or solicitor for the party, and not in any other way, and that it was received professionally, and in the course of business. (*Hager* v. *Shindler*, 29 Cal. 61; *George* v. *Silva*, 68 Cal. 272; *Hatton* v. *Robinson*, 14 Pick. 423; 25 Am. Dec. 415; *Goltra* v. *Wolcott*, 14 Ill. 90; *Granger* v. *Warrington*, 8 Ill. 309; *De Wolf* v. *Strader*, 26 Ill. 224; 79 Am. Dec. 371; *Borum* v. *Fouts*, 15 Ind. 52; *Rochester City Bank* v. *Sage*, 5 How. Pr. 254; *Flack* v. *Neill*, 26 Tex. 273.) And communications made by a third person with a view to employ the witness as an attorney for the party are not privileged as confidential, unless it be shown that such communications were authorized to be made by the party for whom such person assumed to act. (*Synde* v. *McGregor*, 13 Allen, 178.) Nor does the rule apply to conversations had between the attorney and a third party, or between the third parties in the presence of the attorney and client. (*Gallager* v. *Williamson*, 23 Cal. 333; 83 Am. Dec. 114; *Mobile and Montgomery R'y Co.* v. *Yeates*, 67 Ala. 164; *Moffatt* v. *Hardin*, 22 S. C. 9; *Levers* v. *Van Burskisk*, 4 Pa. St. 316.) The communication must be confidential, and so regarded, at least by the client, at the time. The presumption is, that all communications between attorney and client in the course of professional employment are confidential, but this is a presumption that may be rebutted, and if it clearly appears that the same were not intended by the client to have been confidential, it is not privileged. (*Hager* v. *Shindler*, 29 Cal. 63; *Gowen* v. *Emery*, 18 Me. 82.)

The respondent contends that there was no error in this ruling, for the reason that the witness did not positively identify her as being the person who was present at the time the conversation took place. But the witness testified that he believed her to be the person. If

he was mistaken in this it could easily have been proved. But whether it could or not, the point made goes to the weight to be given to his testimony, and not to its competency, and could not justify the order striking it out.

Again, it is urged that the question is·not properly presented. Counsel say that the question submitted to the court below was a question of fact to be determined from evidence, and that, in order to present the question properly, it must have been specified in the statement that the evidence was insufficient to sustain the finding of the court that the witness was incompetent. This would be a novel practice indeed, and one that we are not inclined to adopt. While it is·true that the question of the competency of the witness was one of fact, the evidence upon which the court ruled against the testimony and struck it out appears in the record, and the question as to the correctness of the ruling is directly and properly presented by an exception to the ruling.

It is further contended that the evidence was immaterial, and to strike it out worked the appellant no injury.

The statement in the presence of the respondent that she was the person who desired to bring an action against Mr. Sharon for breach of promise of marriage was inconsistent with her claim that she was then his wife, was a declaration against her interest, and if not true, called upon her for a denial. Having failed to deny it, the fact that such statement was made, and of her failure to controvert its truth, were competent and material evidence against her.

As to the main question, whether the communication was confidential or not, counsel for respondent cite a number of cases, but they are not in conflict with the rules above stated. Some of the cases hold that communications made in contemplation of an employment, although the employment did not occur until later, or the attorney, for some reason, subsequently refused to accept employment, should be protected (*Young* v. *State,*

65 Ga. 525), and others, that it is not necessary that a fee should have been paid at the time of the communication. (*Cross* v. *Riggins*, 50 Mo. 336; *Bacon* v. *Frisbie*, 80 N. Y. 394; 36 Am. Rep. 627; *McLellan* v. *Longfellow*, 32 Me. 494; 54 Am. Dec. 599.) We do not question the correctness of these decisions, but they do not reach this case. There is no evidence here that these communications were made in contemplation of the employment of the witness, or that the respondent intended, at any time, to employ him or to take his advice, as her attorney.

The appellant contends that the contract of marriage, conceding its execution, was void on account of the clause of secrecy contained in it. In discussing this question, counsel have confounded the contract or consent required by the statute and the other requirement that the parties shall assume marital rights, duties, and obligations. They say: "We insist that an agreement for absolute secrecy *of the marriage relation* is void, as contrary to good morals, within the true intent and meaning of the third subdivision of section 1667 of the Civil Code." And their whole argument proceeds upon the assumption that the agreement was to keep secret the *marriage relation.* It is this assumption alone that gives force to their argument. But there was in fact no agreement or stipulation in the contract that the marriage relation claimed to have existed between these parties should be kept secret. The stipulation was: "I agree not to make known the *contents of this paper,* or *its existence* for two years, unless Mr. Sharon himself see fit to make it known." This stipulation did not in any way operate to prevent the full and open assumption by them of marital rights, duties, and obligations, nor could it prevent her from declaring that they were husband and wife. This written consent was not necessary to the validity of the marriage. Had they commenced at once to live together as husband and wife under a verbal

consent to become such, and had mutually and openly assumed marital rights, duties, and obligations, the marriage would undoubtedly have been upheld. We have decided that because they did not assume such rights, duties, and obligations, or in other words, concealed and kept secret the *marriage relation,* there was no valid marriage, but we are quite clear that the secrecy clause in the contract, if the statute had been complied with in this respect, would not have rendered the *marriage* invalid, and that is the real question involved. Nor do we think it would render the contract void as a *consent* to marriage if the statute in other respects had been complied with.

Taking this view of the clause of secrecy, it is unnecessary for us to discuss the effect of a strictly secret marriage which is by stipulation of the parties to be kept secret thereafter.

The parties here did keep the marriage and their relation as husband and wife a secret, if there was a marriage, and for that reason we have held above that the marriage was not consummated, but the question was presented by evidence outside of the contract itself, and could not arise in any other way.

Order reversed, and cause remanded.

SHARPSTEIN, J., and BEATTY, C. J., concurred.

McFARLAND, J., concurring.—I concur in the judgment. I also concur in all the points decided in the opinion of Mr. Justice Works, and in nearly everything that is said in that opinion. It is barely possible, however, that the opinion might be construed as indicating that the decision of this court on the appeal from the judgment was correct,—that is, that the findings support the judgment of the court below, and that its invalidity appears only upon a review of the evidence upon this appeal from the order denying a new trial. I could not

concur in that view. I am as fully convinced now as I was on the other appeal that the findings present a case of logical *felo de se;* and show conclusively on their face that the parties did *not* commence "living and cohabiting together in the way usual with married people," and had *not* "mutually assumed toward each other marital rights, duties, and obligations." In all other respects I concur in the opinion of Mr. Justice Works.

THORNTON, J., concurring. — This is an appeal by defendant from an order denying his motion for a new trial.

I agree with what is said in the opinion of Justice Works as to the record here, except what is said with reference to certifying exhibits left out of the statement on a suggestion of diminution of the record.

I do not understand that on its being made to appear that the record has been diminished by the omission to insert a part of it that this court can order certified to it anything but what is contained in the record in the court below. To constitute a part of the record, the exhibits offered in evidence must be inserted in the statement. This may be done by copying them into the statement, inserting them *in hæc verba,* or by stating their substance or contents. The statement must be complete, — must have all the evidence engrossed in it when allowed and certified by the judge.

When the exhibits are not inserted as pointed out above, they are not part of the record of the court below, whether on file or not, and cannot be brought to this court by its order on any suggestion of diminution.

I have examined the statement as to the exhibits said not to be inserted in it, and find that the contents of several of them do appear in the statement. All of the exhibits referred to are "plaintiff's exhibits." No. 21 is inserted *in hæc verba* on page 1199 of volume 3. The contents of Exhibit 9 are stated in Cushman's dep-

osition, which I think properly here. It is there entitled Exhibit C. Exhibit 23 was an invitation given by Sharon to his daughter's wedding, and the contents were stated by plaintiff in her testimony when it was produced and marked as an exhibit. Exhibit 24 was a blank envelope which contained an invitation to Miss Sharon's wedding, which had been furnished to plaintiff. In the envelope with the invitation was a card "to go on a train," which had to be presented at the train. The plaintiff stated that it was such a card. Exhibit 26 is Dobinson's visiting card, so stated by the plaintiff when giving her testimony. Exhibits 51, 54, and 55 appear to be letters shown a witness (Mrs. Shawhan), who admitted they were in her handwriting. They were signed "1132." Could they be material to any issue before this court? Exhibit 71, according to plaintiff's testimony, was a bill and receipt for meals furnished her from a restaurant. Exhibit 8 was a letter produced by a witness (Cushman) who stated that it was in the genuine handwriting of the defendant, Sharon.

The engrossed statement, in the form in which it now appears in the transcript, was stipulated to be correct by the attorneys for the plaintiff, and on this statement the motion for a new trial was heard. It could not have been heard until the statement was filed (Code Civ. Proc., sec. 660), and it could not have been filed until it was engrossed and certified to be correct by the judge. (Code Civ. Proc., sec. 659.)

This statement as it appears here must have been used on the motion for a new trial, and the statement *so used, by the words of the statute,* is to go into the record to be used on an appeal from an order denying a new trial. (Code Civ. Proc., sec. 661.)

I think that no exhibits at all material have been left out of the record; that those not inserted were omitted because they were regarded by the counsel for both plaintiff and defendant as immaterial.

As regards the depositions, it may be said that the stipulation of the attorneys of plaintiff on the record covers them, and plaintiff cannot object, in the face of this stipulation, to their being regarded as properly in the statement

In passing on the questions presented by counsel in this case, it becomes necessary to determine what was determined in *Sharon* v. *Sharon*, 75 Cal. 1.

The appeal in 75 California was from the judgment, and this is an appeal from an order denying a motion for a new trial in the same case.

The opinion of the court in the former appeal was drawn up by Justice McKinstry and concurred in by Searls, C. J., and Temple and Paterson, JJ. To determine what was ruled on the former appeal we have to examine that opinion.

In my judgment the following propositions were there decided to be law and applicable to the case: —

1. That an agreement between a man and a woman to become husband and wife made *per verba de præsenti* is not invalidated by the fact that it contains a collateral promise by one of the parties not to make the marriage known for two years without the consent of the other.

2. That under section 55 of the Civil Code it is not necessary to the validity of a marriage not attended by a solemnization that the present consent to marry should be followed by a *public* mutual assumption of marital rights, duties, and obligations.

3. That sexual intercourse may be inferred from cohabitation; that evidence that a man and woman have had sexual intercourse, whether direct, or consisting of proof of a further fact from which the intercourse may be inferred, as cohabitation, is, when preceded by the present consent of the parties to marry, evidence that the parties have actually assumed all the duties incident to marriage.

4. That present consent to marry kept secret, followed

by secret cohabitation, is sufficient to constitute marriage.

Near the close of the opinion it is said: "The court below found *as facts* that, during a certain period after the consent to marry, 'the plaintiff and defendant lived and cohabited in the way usual with married people, . . . . and mutually assumed toward each other marital rights, duties, and obligations.' If, as we have said, they might mutually assume marital rights and duties, although their relation was kept secret, the insertion of the words 'toward each other' does not vitiate the finding, and the finding of facts is conclusive on this appeal." (75 Cal. 36.)

As summing up the ruling in the opinion, it is said: " Our conclusion is, that the provision of the code requiring a mutual assumption of marital rights and duties to follow consent does not make it indispensable to the validity of the marriage that the relation between the parties shall be made public." (75 Cal. 37.)

Although the word "public" is used, in the portion last quoted from the opinion, to qualify the nature of the relation, it should be observed that in the portion previously quoted (which, by a few sentences, precedes the portion last quoted) the qualifying words are "although this relation was kept secret."

It seems to me that the fair construction of the opinion is, that it was intended to lay down the rules of law set forth in the propositions above stated as applicable to the relation between the parties, though it was during the whole period of their intercourse kept secret.

In holding that the findings sustained the judgment, the points above stated were, in my view, necessarily held. If they had not been, the court could not have determined to affirm the judgment.

Justice Temple concurred in the prevailing opinion, and expressed his views in plain and direct terms. He said: "The word 'consummation' was avoided in section

55 because it has come to be a euphemism for the more indelicate word *copula*, and thereby has acquired a more narrow meaning than was intended. Therefore, the phrase which only indicates the assumption of the contract relation was used. But in section 57 the word 'consummation' is substituted for the phrase. It cannot mislead here, for it has been defined, but it shows that the mutual assumption of marital rights, duties, or obligations is of the nature of consummation,—something in the nature of part performance of the consent to present marriage; though that is not limited to the *copula*.

"'Sec. 57. Consent and consummation may be manifested in any form, and may be proved under the same general rules of evidence as facts in other cases.'

"Subsequent consummation as well as consent may be manifested in any form. What can this mean except exactly what I have claimed for it? And if in any form, why not by secret cohabitation, where the husband claims the right, believing himself a husband, and the wife submits, because she believes herself a wife?" (75 Cal. 51.)

The points ruled as above stated arose in the case and were argued by counsel. They cannot in any respect be regarded as *obiter dicta*.

The points decided in a cause by this court constitute "the law of the case."

This has been frequently held by this court. It was substantially so held in the case of *Dewey* v. *Gray*, 2 Cal. 377, which was the first case in this court in which the doctrine of the law of the case was applied. In *Clary* v. *Hoagland*, 6 Cal. 685, the court (by Murray, C. J.) said: "It is well settled that when a case has been taken to an appellate court and the judgment obtained on points of law involved, such judgment, however erroneous, becomes the law of the case, and cannot on a second appeal be altered or changed." (6 Cal. 687, 688.) "A previous ruling by the appellate court," said the court, by Field,

J., in *Phelan* v. *San Francisco*, 20 Cal. 45, "upon a point distinctly made, may be only authority in other cases, to be followed and affirmed, or to be modified or overruled, according to its intrinsic merits." The same proposition is stated again as sound law in the opinion in *Leese* v. *Clark*, 20 Cal. 416, 417; and it is further said in that opinion: " The decision is no longer open for consideration, whether right or wrong; it has become the law of the case." (See cases cited in *Leese* v. *Clark*, *supra*, and *Mulford* v. *Estudillo*, 32 Cal. 131; *Megérle* v. *Ashe*, 47 Cal. 632; *Jaffe* v. *Skae*, 48 Cal. 540; *Donner* v. *Palmer*, 51 Cal. 636; *Heinlen* v. *Martin*, 59 Cal. 181.) It is true that what has been decided as the law of the case is applicable only while the facts are the same,—substantially unchanged. (*Megerle* v. *Ashe*, *supra*; *Donner* v. *Palmer*, *supra*.)

It is contended here, conceding the rule as to the " law of the case " to be as stated above, that it does not apply to this case, that it only applies where the cause is sent back to the court *a qua* for some further proceeding to be there had in it, as when a judgment or order denying a new trial is reversed, and the cause remanded to be again tried.

In *Leese* v. *Clark* the question of the conclusiveness of the former decision in this court is considered. It is there said: "But in the case in which the decision is made, it is more than authority,—it is a final adjudication, from the consequences of which the court cannot depart, nor the parties relieve themselves." After stating that this has been the uniform doctrine of this court for years, and after repeated examinations and affirmations, it cannot be considered as open to further discussion, and that it is the doctrine of the supreme court of the United States, and of the supreme courts of several of the states, citing several authorities for the statements made, the opinion proceeds thus: "And the reason of the doctrine is obvious. The supreme court has no

appellate jurisdiction over its own judgments; it cannot review or modify them after the case has once passed, by the issuance of the *remittitur,* from its control. It construes, for example, a written contract, and determines the rights and obligations of the parties thereunder, and upon such construction it affirms the judgment of the court below. The decision is no longer open for consideration. Whether right or wrong, it has become the law of the case. This will not be controverted. So, on the other hand, if upon the construction of the contract supposed this court reverses the judgment of the court below and orders a new trial, the decision is equally conclusive as to the principles which shall govern on the retrial. It is just as final to that extent as a decision directing a particular judgment to be entered is as to the character of such judgment. The court cannot recall the case and reverse its decision after the *remittitur* is issued. It has determined the principles of law which shall govern, and having thus determined, its jurisdiction in that respect is gone. And if the new trial is had in accordance with its decision, no error can be alleged in the action of the court below."

The same rule is laid down in *Ex parte Sibbald* v. *United States,* 12 Pet. 488. In that case the supreme court had entered its decree reversing in part the decree of the superior court of East Florida in *United States* v. *Sibbald,* 10 Pet. 313–325, and had remitted to the superior court its mandate to be executed. The lower court refused to execute the mandate, and the party concerned (Sibbald) proceeded by petition (there were two) to procure the enforcement of the mandate of the court.

On the hearing of these petitions Mr. Justice Baldwin delivered the opinion of the court. He said:—

"Before we proceed to consider the matter presented by these petitions, we think proper to state our settled opinion of the course which is prescribed by the law for this court to take, after its final action upon a case brought

within its appellate jurisdiction as well as that which the court, whose final decree or judgment has been thus verified, ought to take.

"Appellate power is exercised over the proceedings of inferior courts, not on those of the appellate court. The supreme court have no power to review their decisions, whether in a case at law or in equity. A final decree in chancery is as conclusive as a judgment at law. Both are conclusive on the rights of the parties thereby adjudicated.

"No principle is better settled or of more universal application than that no court can reverse or annul its own final decrees or judgments for errors of fact or law after the term in which they have been rendered, unless for clerical mistakes, or to reinstate a cause dismissed by mistake; from which it follows that no change or modification can be made which may substantially vary or affect it in any material thing. Bills of review in cases of equity, and writs of error *coram vobis* at law, are exceptions which cannot affect the present motion.

"When the supreme court have executed their power in a cause before them, and their final decree or judgment requires some further act to be done, it cannot issue an execution, but shall send a special mandate to the court below to award it. Whatever was before the court and is disposed of is considered as finally settled. The inferior court is bound by the decree as the law of the case, and must carry it into execution according to the mandate. They cannot vary it or examine it for any other purpose then execution, or give any other or further relief, or review it upon any matter decided on appeal for error apparent, or intermeddle with it further than to settle so much as has been remanded. After a mandate no rehearing will be granted. It is never done in the house of lords; and on subsequent appeal, nothing is brought up but the proceeding subsequent to the mandate." (12 Pet. 491.)

The above, it will be observed, is stated as the settled opinion of the supreme court of the United States as to the course they should pursue upon its decree or judgment after its final action upon a case brought within its appellate jurisdiction.

In the case cited the trial court had taken no action upon the mandate sent down to it. The supreme court held it, nevertheless, as binding on itself as though it had. It laid down the general rule that no court can interfere with its own judgments after its jurisdiction over them has ceased (except in a few cases, neither of which appears here); that when the cause has gone beyond its jurisdiction it can neither reverse nor annul its decree or judgment for any errors, whether of fact or law; that, in such a case, the judgment is just as binding on the higher as on the lower court.

The ruling in *Sibbald's Case* was approved in *Washington Bridge Company* v. *Stewart*, 3 How. 426, and is, no doubt, the settled law of the United States supreme court. There are other cases to the same effect in that court which need not be referred to. They can be readily found in the digests.

We think it settled law in this state, fixed and beyond debate, that the points involved in a cause finally decided by this court are beyond its jurisdiction; that it has no power to reverse or modify its judgment after the case has passed by the issuance of its *remittitur* from its control; that such decision, whether right or wrong, is binding on this court and every other court; that it is a final adjudication, from the consequences of which this court cannot depart, nor the parties relieve themselves. As was said by Field, J., speaking for the court in *Leese* v. *Clark, supra:* "The court cannot recall the case and reverse its decision after the *remittitur* is issued." (20 Cal. 417.) Its jurisdiction over the case is gone.

The contention of the defendant limiting the applica-

bility of the rule of the law of the case finds no countenance in any decision of this court.

The *remittitur* has long since issued on the former appeal, and cannot now be recalled. The power of this court in regard to that appeal has long since ceased.

In none of the cases cited by counsel for appellant (*Walden* v. *Murdock*, 23 Cal. 540; 83 Am. Dec. 135; *Fulton* v. *Hanna*, 40 Cal. 278, 281, and *McDonald* v. *McConkey*, 57 Cal. 325) is there anything, in my judgment, adverse to what has been said above. They are all in harmony with it. Where a judgment is affirmed, a new trial may still be granted after such affirmance on errors of law not considered or passed on in affirming the judgment, but a new trial cannot be granted when the court, in order to grant it, contravenes what has been adjudicated by the previous decision.

The numerous cases decided by this court with regard to the law of the case may be easily found by reference to the digests; what has been said above is in line with what is decided in them.

We pass to the points made on the insufficiency of the evidence to justify the decision.

It is urged that the second finding, that "the marriage contract" was signed by William Sharon, cannot be held by this court to be justified by the evidence.

*In limine*, I will say that in my judgment the opinion of the learned judge in this case, before whom it was tried in the superior court, is not a part of the record on this appeal. That opinion is not in the transcript on this appeal, and this court cannot look into it in another record. The record on the former appeal can be looked into to ascertain what facts were then before the court, so as to see to the correct application of the rule that such decision is the law of the case. (*McKinley* v. *Tuttle*, 42 Cal. 576.) We can look into the opinion of Judge Sullivan in this case when it relates to any question of law arising in this case, or in any other case, just as we

may examine the opinions or judgments of any court, to enable the court to determine what the law is applicable to the facts of a case which is before it for determination.

But we cannot look into the opinion of Judge Sullivan to ascertain in what mode he dealt with the credibility of witnesses, or what weight or value he accorded to the evidence before him in deciding this case. To pass on any point in the case, whether relating to insufficiency of the evidence or any other matter debated, we are confined by the law to that which may be found on the pages of the transcript furnished to us on this appeal.

Now, in regard of the evidence as to the signing of the marriage contract by William Sharon, the plaintiff testifies that he signed it in her presence after it was written. Sharon testified that he never signed it. This presents a substantial conflict.

The circumstantial evidence bearing on the issue of the execution of this paper does not remove this conflict. That evidence is also conflicting. Whatever view is taken of the evidence on this issue, a substantial conflict is presented. Hence there can be no reversal of the order on the ground that the evidence is insufficient to justify the second finding.

Granted that it does appear on a comparison of the finding and the evidence that the court below must have found that the plaintiff testified falsely as to Sharon's introducing her as his wife, still the law does not require the rejection of her testimony on other points. The rule for the guidance of the trial court is thus expressed in the code: "That a witness false in one part of his testimony is to be distrusted in others." (Code Civ. Proc., sec. 2061.) I cannot go so far as to say that this distrust was not exercised, and that the credibility of the plaintiff was not weighed by the trial court according to the mandate of this rule. The credit to be given to the witness was for the court below, and not for this court.

Admitting that this court might go further on an extreme case, I cannot say on this record that this is such a case.

It is also urged that the evidence is insufficient to justify the third finding, which is in these words:—

"That afterward, and about the —— day of September, 1880, the plaintiff and defendant commenced living and cohabiting together in the way usual with married people, although their cohabitation was kept secret, and so continued for the space of more than one year, and down to the twenty-fifth day of November, 1881, and during all of said time the plaintiff and defendant mutually assumed toward each other marital rights, duties, and obligations."

In the sense in which cohabitation is regarded by the counsel for the appellant, the evidence does not show it. There is no evidence of such cohabitation as is defined in *Yardley's Estate*, 75 Pa. St. 211; or *Ohio* v. *Connaway*, Tapp. 59; or in *Calef* v. *Calef*, 51 Me. 366; 92 Am. Dec. 549; or in Bouvier's Law Dictionary, under the word Cohabit; or in any other case or book of authority. The evidence does not show any "living together" by the parties ostensibly as husband and wife. (See 1 Bishop on Marriage and Divorce, 6th ed., 777, and note 2.)

But the evidence does establish what was found by the trial court, and the court on the former appeal held this was, with other matters found, sufficient to constitute marriage.

As appropriate to this question, and to show what was decided on the former appeal in this case, in addition to what has been said previously in this opinion and the quotations from Justice McKinstry's opinion, I will refer to some other portions of the opinion. In it it is said:—

"The word 'consummation,' whenever used as something different from the mere consent or formal solemnization of marriage, had always been held to mean 'simply sexual intercourse,—copulation,—nothing more

nor less.' Section 57 of our Civil Code provides how this consummation may be proved."

On page 33 it is said: "There are two principal ends of marriage,— a lawful indulgence of the passions, to prevent licentiousness, and the procreation of children under the shield and sanction of the law. (Stewart on Marriage and Divorce, sec. 103.) The intercourse, which is the means by which these ends are attained, is both a right and duty. Evidence that the man and woman have enjoyed the right and discharged the duty, whether direct or consisting of proof of another fact from which the intercourse may be inferred,— as cohabitation,— is, when preceded by present consent to marry, evidence that the parties to the contract have actually assumed all the duties incident to marriage."

Taking the paragraphs quoted together, I think it was intended to decide, and that the court did hold and decide, that secret sexual intercourse following a present consent to marry *consummates* the marriage. Cohabitation is only regarded as a circumstance proving such intercourse, while it is said that this intercourse may be proved by direct evidence. The court intended to decide that the consent and the intercourse above stated consummated the marriage, and was an assumption of marital rights, duties, and obligations. The cohabitation spoken of in the opinion of Justice McKinstry means nothing but occupying the same bed. In determining what is decided in a cause, we must give to the words used the sense in which they were employed in it; and in my judgment the word "cohabitation" is used in the opinion to denote what is stated above. Cohabitation was only evidence of what was regarded as consummation, viz., the intercourse mentioned above. In my opinion it was decided, and the court intended to decide, that if the parties consented to marry *per verba de præsenti*, this consent was followed by sexual intercourse, though everything in relation to the marriage was enacted by

them under "a cloak of darkness," that the marriage was perfected, became *verum matrimonium*. The decision of the court may be expressed by a little change in the maxim, *Consensus, non concubitus, facit nuptias*. Let it be read, *Consensus et concubitus faciunt nuptias*, and it will express the conclusion reached.

In this view, the kind of cohabitation spoken of by counsel becomes immaterial. The court having decided as is explained above, there was no necessity for the cohabitation contended for to constitute the marriage.

The evidence does establish such cohabitation as was found by the court, and does not establish the cohabitation urged in the argument of appellant's counsel. The court has to apply the law of the case to the facts which are established by the court. This rule must be applied in all the proceedings in the case. The evidence establishes the same facts as the court acted on, and the law of the case must always be applied when the facts are unchanged. To fail to do so would be a mere evasion, and in making such application to the evidence it must be held to prove all the cohabitation required by law.

The opinion relative to this question was, in my judgment, erroneous. But the court is controlled by the law of the case, and cannot, in this case, reverse the former decision.

The only question left open, in my judgment, by the former decision was whether the sexual intercourse between the parties in this case was licit or illicit. If it was had in pursuance of the present consent, it was licit; if not, it was illicit. I can find no evidence in the record that this intercourse was disconnected from the contract, and not in pursuance of it. I will add that in considering this point the contract must be regarded as genuine, in obedience to the former decision. It is argued that the decision herein is against law; but the evidence, as we have seen, establishes the facts as they are found, and the court on the former appeal held that

the plaintiff was entitled to have judgment entered on them in her favor. It may be said, then, that on the same facts the court has held that the decision is not against law, for it affirmed a judgment entered on them. The opinion on the former appeal compels an adverse ruling on the contention that the decision is against law.

On the question of the illegality of the marriage contract by reason of the clause of secrecy, I cannot perceive that the question is changed on this appeal from what it was on the former appeal. In fact, the same point was made and argued on the former appeal as now, and determined adversely to the contention of appellant. The court there held that the marriage contract was not rendered void by the clause of secrecy, and to that ruling this court must defer.

I concur in the opinion of Justice Works as to the decree of the circuit court of the United States in *Sharon* v. *Terry*, and in what is said as to the ruling in regard to the admission of the testimony of Martha Wilson and the exclusion of that of the attorney, Hornblower.

As regards the question put to the witness Mrs. Samson, I am inclined to think that the court had a right in its discretion to allow the question to be put, the witness having the privilege of refusing to answer it. In saying this I do not intend to say that *People* v. *Hamblin,* 68 Cal. 102, is not properly decided. The decision there may be sustained on the principle which ruled *People* v. *Crapo,* 76 N. Y. 288; 32 Am. Rep. 302. As the order is reversed and the cause cannot be tried again, it is not necessary that I should express a decided opinion upon the point (the question put to Mrs. Samson). I prefer to reserve the question for further examination and consideration when the same or a like question shall come before this court.

I rest my concurrence in the reversal of the order upon the exclusion of the testimony of the witness Hornblower. This testimony was relevant to the main issue

in the cause, viz., the genuineness of the marriage contract. The defendant was clearly injured by its exclusion, and therefore I am for reversing the order denying the motion for a new trial.

PATERSON, J., concurring. — It is manifest that so long as the decree of the United States circuit court — the execution of which is not stayed by appeal or writ of error (*Slaughter-house Cases*, 10 Wall. 273) — remains in force and effect, a prosecution of plaintiff's cause of action in any proceeding in the state courts can result only in great expense and annoyance to all the parties, and a conflict of authority in which the paramount decree of the circuit court is bound to prevail. We know as well now as we shall ever know the scope and effect of the decree referred to, and the construction given to it by the federal judges in their decisions. (*Sharon* v. *Hill*, 11 Saw. 290; *Sharon* v. *Terry*, 36 Fed. Rep. 337; 131 U. S. 40.) These decisions are official acts of the judicial department of the United States, the matters therein decided are matters of notoriety, the verity of such matters is not disputed, and we are as much bound to notice them as we are the laws of nature or the acts of the legislature. (Code Civ. Proc., sec. 1875, subd. 3; *Romero* v. *United States*, 1 Wall. 742; "Matters requiring judicial notice," 28 Am. Law Reg., 2d series, 193.)

It has seemed to me, therefore, that this court ought not to now reverse the order denying a new trial in the court below; but on the ground of public policy, of comity, and to prevent vexation and expense to the parties, and an unseemly conflict between the state courts and a federal court claiming concurrent jurisdiction and a priority of right to enforce its decree, all proceedings should be stayed until it be finally determined by the supreme court of the United States whether the prohibitory injunction of the circuit court should be made perpetual. But as a majority of the court are of opinion

that this is not the proper time and place to consider the effect of the decree referred to, but that a decision should be rendered on the matters contained in the record herein without regard to the decisions of the national courts, I feel in duty bound to support my associates in their judgment of reversal by saying that in my opinion no other conclusion could have been reached on the questions presented by the record without a violation of well-established principles of law.

Unless we are prepared to say that in actions tried without a jury the findings of the court ought not to be disturbed on account of errors in the admission and exclusion of testimony, there are two or three errors in this case which would of themselves necessitate a reversal of the order.

The main contention in the case was upon the question whether defendant and plaintiff were husband and wife,— whether there had been a consent to marry, followed by a mutual assumption of marital rights, duties, or obligations, as required by the code to constitute marriage. The testimony of Hornblower, which was excluded, was most material on this issue, and, as shown in the leading opinion, was clearly admissible. If admitted, it would have tended to show, at least, that there never was a mutual assumption of marital rights, duties, or obligations by the parties. If it be true that plaintiff expressed the intention of commencing an action against defendant for breach of promise to marry, that fact would show that plaintiff did not at that time regard herself as his wife, and there is no pretense that a marriage occurred after the time of the conversation with Hornblower. Nothing could have been more pertinent to the question the court had to determine, and being the declaration of the party against her interest, it is impossible to tell, in view of the state of the evidence, what effect it might have had on the mind of the judge if he had admitted and considered it. The evidence

upon the question whether the marriage contract was genuine or not was conflicting. The evidence of Hornblower was material on that issue. The court below found that the parties to the marriage had "lived together in the way usual with married people," and that there had been "a mutual assumption of marital rights, duties, or obligations." This court has found that these findings are not supported by the evidence; that they never lived together as married people usually do; and that there was no mutual assumption of marital rights, duties, or obligations.

If it be conceded that there was material evidence tending to support these findings of the court, it must be admitted that the declaration sought to be shown by the witness Hornblower—and we cannot say the court would not have believed him—would have tended strongly to show that she had never, in good faith, assumed any marital rights, duties, or obligations. I agree that if there be a consent to marry, and any mutual marital duty performed in good faith in pursuance of the contract to marry, the marriage is complete. One act of coition is sufficient evidence of consummation; but it must be an act performed in good faith and in pursuance of the contract by the party claiming the existence of the marriage at least, in order to consummate the marriage. It was not decided in the former decision herein that consent alone would constitute a marriage *under the laws of this state*, or that copulation was *conclusive evidence* of consummation. The only question was whether the findings supported the judgment. The contentions were, that the secrecy clause invalidated the contract, and that the finding that the defendant had never introduced plaintiff as his wife, and that they had never been reputed to be husband and wife, showed there could not have been a living together in the way usual with married people, or any mutual assumption of marital rights, duties, or obligations. The opinions rendered

on the appeal from the judgment must be read in the light of the facts found in the findings of the court. I do not see how there can be any misapprehension as to what was decided on the former hearing. It was held: 1. That the contract to marry was valid, notwithstanding the stipulation as to secrecy; and 2. That the finding of a mutual assumption of marital rights, duties, and obligations was not nullified by the finding that the defendant had not introduced plaintiff as his wife, and that they were not reputed to be husband and wife. The court held—and its conclusion has never been effectively assailed, in my opinion, by the arguments made herein, except in so far as they dealt in sentiment and were clothed in phrases which tickle the ears and please the hearts of those who do not like the law, and which would be better directed if addressed to the legislature—that, under the law of this state, when parties competent to marry enter into a contract to marry, and in pursuance thereof perform any marital right, duty, or obligation, the marriage is consummated; and that it would not lie in the mouth of one of the parties, after he or she had enjoyed the person of the other who had performed his or her part in good faith in the consummation of the marriage, to say that the marriage was not complete because by mutual agreement it had not yet become known to their friends that they had entered into the contract and had been enjoying the same bed. As Mr. Justice McKinstry well said: "It is incredible the legislature intended that copulation may take place before the marriage is complete, or to put it in the power of the man after he has enjoyed the person of the woman to say, 'I will proceed no further.' Yet it is the duty of the woman after mutual consent to present marriage to live with the man, and their cohabitation must from the nature of things create the presumption of copulation, which reduces the statute to an absurdity." The combined wisdom of all who have attacked the reasoning

upon which the judgment was affirmed on the findings has been unable, in my judgment, to offer even a plausible explanation of the "logical *felo de se*" in their construction of the statute thus pointed out by Justice McKinstry.

But the questions before us now are, whether the contract was made, and whether the *evidence* shows that there was a consummation of the marriage,—a mutual assumption of marital rights, duties, and obligations. On both of these questions the evidence of Hornblower was most material, and it was prejudicial error to exclude it.

The rulings of the court on the cross-examination of certain witnesses are as clearly erroneous. Nothing is better settled in this state than that the character of a witness cannot be impeached by evidence of particular wrongful acts.

A petition for a rehearing having been filed, the following opinion thereon was rendered on the 20th of August, 1889:—

Fox, J.—The petition for rehearing in this cause is denied.

One of the points made in the petition is to the effect that the court ought to vacate the judgment made and given herein on the seventeenth day of July, 1889, on the ground that the appeal from the order denying the new trial ought not to have been entertained, because the steps taken in the lower court for a new trial were premature, having been taken before the coming in of the report of a referee appointed by the court to report upon the amount and character of the community property of the parties, and that the court below had no jurisdiction to hear the same.

Before the argument of this case upon the appeal from the order denying motion for new trial, a formal motion was made to dismiss the appeal upon several grounds, one of which was substantially the same as the ground

of this objection. The motion was elaborately argued, orally and upon briefs, and upon due consideration was by the court denied. The court fully considered the question of jurisdiction to hear and determine the motion for new trial, and the appeal from the order denying the same, at the time, and we see no reason to change the conclusion then reached.

The action is for divorce, and before any steps were taken in the matter of a motion for new trial, the cause had been tried upon its merits, and the court had made and filed its decision and findings upon all the issues in the cause necessary to the entry of a judgment and decree for divorce, and had ordered judgment and decree accordingly. As ancillary to that decree, the court found that the plaintiff was entitled to a division of the community property, but was at the time unadvised as to what was community property. It appointed a referee to take testimony and report to the court upon that question. But that question was not one necessary to be investigated prior to the entry of judgment for divorce. In practice, the settlement of alimony and the distribution of community property are matters which are frequently and properly done after judgment,—sometimes long after, —and so far as relates to alimony is the subject of frequent change. Orders in this behalf are orders after judgment, and are themselves the subject of appeal. It is never held that motions for new trial must or can properly be delayed until the final settlement of all matters which may lawfully be the subject of consideration and order, or even of supplemental decree after judgment.

The reference in this case was not one for the taking of an account, or for report upon any subject necessary to enable the court to render judgment upon the issues in the cause, but was one for the purpose of securing information necessary for carrying a judgment already ordered into effect. (Code Civ. Proc., sec. 639.)

A new trial is the re-examination of an issue of fact, in the same court, after a trial and decision by the

court. (Code Civ. Proc., sec. 656.) In this case all the issues necessary to final judgment had been tried and determined. All that remained was to carry the judgment into effect. The time had come when, if ever, a motion to vacate that decision, and for a new trial, must be made, under the provisions of the Code of Civil Procedure, secs. 657 et seq. It was regularly made, heard, and determined, and from the order denying such motion an appeal was regularly prosecuted to this court. The court had full jurisdiction to hear and determine such appeal.

Here all the issues in the case necessary to determine whether or not the plaintiff was entitled to a decree for divorce, and also whether she was entitled to share in the community property, had been tried and determined by the court, and the court had determined the same, and filed its findings thereon, and judgment could be, and thereafter in due course was, entered thereon. All that remained was to carry that judgment into effect by making division of the community property, as provided in the decision and in the judgment that followed. The judgment of the court on the issues involved was a final judgment. (_Clark_ v. _Dunnam,_ 46 Cal. 208.) Within ten days after notice of that decision it was the duty of the defendant to take the initiatory steps toward moving for a new trial, if he ever intended to make such motion, and thereafter to prosecute the same with diligence to a determination. He had the right to waive the notice, and take these steps without waiting for notice. Our conclusion is, that the motion for new trial was not prematurely made, and that the court had full jurisdiction to entertain the same, and to hear and determine the motion. It follows that this court had full jurisdiction to hear and determine the appeal from the order denying such motion.

BEATTY, C. J., WORKS, J., SHARPSTEIN, J., PATERSON, J., McFARLAND, J., and THORNTON, J., concurred.